THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| RICHARD REYNOLDS, ET AL., Individually and on behalf of other employees similarly situated, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| WYNDHAM VACATION RESORTS, INC., and WYNDHAM OWNERSHIP, INC., | ) ) ) | C.A. NO. 4:14-cv-2261-PMD |
| Defendants. | ) ) ) | |

## DEFENDANTS' MEMORANDUM OF LAW
## IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

Defendants Wyndham Vacation Resorts, Inc. and Wyndham Vacation Ownership, Inc. ("Wyndham" or "Defendants"), by and through undersigned counsel submit this Memorandum of Law in Support of Their Motion for Summary Judgment. In this lawsuit, Plaintiffs, former timeshare sales representatives of Wyndham, seek unpaid wages under the Fair Labor Standards Act ("FLSA") for time allegedly spent working off the clock. As set forth below, Wyndham is entitled to summary judgment on Plaintiffs' claims as follows:

1.      Plaintiffs' claims should be dismissed to the extent they are barred by the applicable statute of limitations.

2.      Richard Reynolds lacks standing and is judicially estopped from asserting his claims because he failed to disclose such claims in a bankruptcy petition.

3.      Plaintiffs cannot meet their burden to demonstrate a willful violation under the FLSA, and, therefore, their claims are subject to a two-year statute of limitations, and all claims

asserted outside a two-year limitations period should be dismissed.

4.      Wyndham's sales representatives are exempt from the FLSA pursuant to the exemption for commissioned employees of retail or service establishments pursuant to 29 U.S.C. § 207(i) of the FLSA ("Section 7(i)").

5.      Wyndham is entitled to summary judgment during the weeks for which Plaintiffs have conceded they can assert no claim for minimum wage and/or overtime compensation.

Accordingly, the Court should grant Defendants' Motion for Summary Judgment.

## I.      FACTUAL BACKGROUND

### A.      Plaintiffs Have Failed to File Consents With The Court And Cannot Assert Timely Claims Under The FLSA.

Each of the following Plaintiffs admitted that he or she last worked for Wyndham on the dates indicated and have not been employed by Wyndham since:

- Steven Bradley—August 9, 2013 (Bradley Dep. 17:7-11.) [1]

- April McLean—February 26, 2013 (McLean Dep. 23:12-14.)

- Donna Weinberg—April 18, 2013 (Weinberg Dep. 21:8-15.)

- Jonathan Anderson—July 8, 2013 (Anderson Dep. 20:8-14.)

- Richard Reynolds—May 7, 2012 (Reynolds Dep. 22:17-23:3.)

- Sharon Linick—March 29, 2012 (Linick Dep. 31:10-12.)

- Linda Neely—March 17, 2012 (Neely Dep. 24:5-13.)

- Joseph Schubert—April 10, 2012 (Schubert Dep. 25:5-22.)

- Doreen Mastandrea—May 2012 (Mastandrea Dep. 24:2-6.)

- William Suitt—Suitt was promoted to a management position on February 25, 2011, and has not worked in a non-management position since that time (Suitt Dep. at 25:2-10).  Suitt concedes that he has no claims under the FLSA for the

---

[1] Excerpts from the cited depositions are attached as Exhibit 1.

time period he was employed as a manager. (Suitt Dep. at 35:24-36:3.)[2]

It is a matter of record in this case that no consent has been filed for any of these individuals as required by the FLSA.[3]  The present action was brought as a collective action on behalf of the named Plaintiffs and other allegedly similarly situated Plaintiffs, and every Complaint and Amended Complaint filed in this case is entitled "Collective Action Complaint."  (ECF No. 1, 37, 61.)  Plaintiffs have also filed a motion for conditional class certification. (ECF No. 69.)

**B.     Richard Reynolds' Bankruptcy Petition.**

Before filing this action, on October 23, 2013, Reynolds filed a petition in bankruptcy under Chapter 13.  (*See* Exhibit 2, Reynolds Bankruptcy Petition.)  In conjunction with filing this petition, Reynolds was required to file schedules setting forth his assets and related financial information.  When completing Schedule "B" (Personal Property), Reynolds was required to disclose "other contingent and unliquidated claims of every nature."  Reynolds answered "None" to this question and otherwise failed to disclose this lawsuit.  Reynolds declared under penalty of perjury that his schedules were true and correct.  (Ex. 2, p. 5.)

Reynolds was also required to complete a "Statement of Financial Affairs" in connection with his Bankruptcy Petition and was required to disclose, under penalty of perjury, "all suits and administrative proceedings to which the debtor is or was a party within one year immediately preceding the filing of this bankruptcy case."  Reynolds reported "None" and otherwise failed to disclose this action.  (Ex. 2, p. 13.) Reynolds also declared under penalty of perjury that his Statement of Financial Affairs was true and correct.  Subsequently, the bankruptcy court relied on his false representations in adjudicating the bankruptcy proceeding.

---

[2] In addition to these Plaintiffs, Plaintiff Mike Smith's claims will become completely time barred on 9/26/15 because he last worked for Wyndham on 9/26/13 (Smith Dep. 24:23-25:5).
[3] Consents have been filed on behalf of Larry Marshall, Edwardo Valasco, and Michelle Johnson (ECF Nos. 61-1, 61-2, 61-3). The other 15 Plaintiffs have not filed consents.

### C.    Wyndham's Business Operations.

Wyndham is a leading provider of family vacations to resort destinations.  (Affidavit of Barb Masticola, ¶ 3, filed at ECF No. 80-1, "BM, ¶ _".)  Owners purchase vacation "points" that may be used at resorts and other locations.  *Id*.  Wyndham employs individuals in sales positions including In-House Sales Representative ("IH Rep"), Frontline Sales Representative ("FL Rep") and Discovery Sales Representative ("Disco Rep").  (Barber Dep. 15:3-7.)  These employees meet with potential owners to sell Wyndham's packages.  (*Id*. at 57:23-58:13.)

Purchasers of Wyndham's products do not purchase a partial interest in a specific condominium unit.  (*See* Exhibit 3, Affidavit of Wayne Rickman ¶ 5.) Linick Dep 80:18-81:18; 83:3-15).   Rather, purchasers acquire points, which they can then use to make travel arrangements among many of the resort accommodations offered by Wyndham.   (*Id.*) Wyndham's points program offers a large selection of options for destinations and provides flexibility in terms of time and location of travel.  (*Id.*at ¶ 5) Although purchasers are deeded a timeshare interest, and that interest is transferrable by sale, gift, inheritance, or through a marital dissolution, other features of the Wyndham program are not transferrable.  (*Id.*at ¶ 6)  For example, purchasers may obtain "perks by Club Wyndham" which provides travel-related benefits and privileges to its members.  (*Id.*at ¶ 6)  Such membership in "perks by Club Wyndham" is nontransferable and cannot be resold.  (*Id.*at ¶ 6)  Similarly, purchasers may receive Wyndham rewards points or Club Wyndham bonus points in connection with their purchase, which are not transferrable.  (ECF No. 65-3 at DEF 008182.)  If a loan is used for purchase, Wyndham obtains an Article 9 security interest in the ownership rights acquired by the purchaser.   (*Id.* at DEF 008170.)   The purchase of a timeshare interest, therefore, differs significantly from the traditional purchase of real estate.

Wyndham Owners may also utilize the Plus Partners program through which they can

purchase hotel stays, airline tickets with major airlines, car rentals from major car rental companies, and other amenities using their points. (Ex. 3 ¶ 7) Through the Plus Partners program points may also be used to purchase cruise tickets with cruise lines such as Carnival, Royal Caribbean, Norwegian Cruise Line, Holland America, Viking River Cruises, or Princess Cruises. (Ex. 3 ¶ 7) Through the Plus Partners program points may also be used to purchase tickets to amusement parks such as Disney World or Sea World. (Ex. 3 ¶ 7)

FL Reps work out of the Company's preview center located on Second Avenue South in North Myrtle Beach. (Barber Dep. 12:13-16.) FL Reps sell interests in timeshare resorts, typically to guests who have never purchased a Wyndham product. (*Id.* at 58:10-11.) They work in a sales center where guests are scheduled in "tour waves" at specific times, though the times and number of waves varies depending on the season. (BM, ¶ 5.) IH Reps work at four different Wyndham resorts in and around Myrtle Beach.[4] (BM, ¶ 6.) IH Reps sell upgraded vacation packages to Wyndham owners or their guests ("owners"). (Barber Dep. 58:11-13.)

Disco Reps work out of the Second Avenue South preview center in North Myrtle Beach. (BM, ¶ 8.) Disco Reps are very different than FL or IH Reps. Disco Reps sell trial, non-ownership vacation packages to customers who have declined to purchase a deeded timeshare from a FL Rep. (*Id.*) When the guest or "table" is "turned over," the Disco Rep conducts a survey about the guest's experience. *Id.* While conducting the survey, the Disco Rep offers guests a "discovery package," which is the trial ownership package. *Id.* Disco reps do not sell any real estate interests. (Crawford Dep. 33:1-19; Velasco Dep. 24:2-4; Linick 49:20-51:9.)

IH, FL, and Disco Reps receive a "recoverable draw," which is an amount equal to the minimum wage for every hour worked. (ECF No. 80-2, Declaration of Jeanie Willis, cited as

---

[4] The resorts include Ocean Boulevard, Towers on the Grove, Sea Watch, and West Winds.

"JW ¶ __", JW, ¶ 4).  The draw is paid weekly and is an advance against the Rep's future commissions which is recoverable by Wyndham when the Rep earns enough in commissions to cover the amount advanced.[5]  *Id.*  If the Rep does not earn enough in commissions to pay back the advanced draw, the remaining amount of the advance is considered a "draw balance" that is carried forward from pay period to pay period until the draw balance is fully recovered or the employee's termination.  *Id.*  If a Sales Rep has no draw balance, then, in effect, all of the income that the Rep has earned is through commissions.  On the other hand, if a Rep carries a draw balance, then the commissions represent the total income earned minus the draw balance.

For most of the Plaintiffs during most of his or her employment, income from commissions far exceeds the amount of the recoverable draw.   In fact, Wyndham's Sales Reps are highly compensated with many, including several of the named Plaintiffs, earning over $100,000 annually. (Bradley Dep. 128:25 – 129:5; McLean Dep. 47:14-20; Suitt Dep. 103:7-11; Velasco Dep. 104:2-8.)  Steven Bradley testified that he made approximately $300,000 during one year and received one *weekly* paycheck of more than $30,000.  (Bradley Dep. 119:5-14.)

In an abundance of caution, Wyndham treats its Sales Reps as non-exempt from the overtime and minimum wage requirements of the FLSA.  Sales representatives are required to clock in at the beginning of each shift and to clock out when leaving and Wyndham prohibits employees from working off the clock.  Wyndham's compensation system ensures Reps are

---

[5] This method of compensating commissioned salespeople is widespread and entirely consistent with the FLSA. *See* 29 C.F.R. § 779.413(a) (noting in context of retail store employees that compensation system whereby employee receives straight commission with "advances, guarantees, or draws" is an appropriate method of compensation under FLSA); Dept. of Labor Op. Letter FLSA-1045 (June 15, 1982) ("Where an employer has fulfilled [the minimum wage] requirement in a pay period in which the employee has earned less than that amount in commissions, the difference between what the employee earned in commissions and the minimum wage may be deducted from any commissions earned in a subsequent pay period which are in excess of the minimum wage required to be paid for the hours worked in that pay period"); Dept. of Labor Op. Letter FLSA – 671 (July 15, 1983) (same).

compensated at least minimum wage for all hours reported under 40 and 1.5 times the minimum wage for hours over 40 in a work week.  (JW, ¶ 4.)

###    D.    Wyndham's Timekeeping Policies.

Wyndham's Timekeeping and Overtime Policy requires Sales Reps to accurately account for all time worked on a daily basis, including recording the times that they begin and end work and meal periods.  (Bradley Dep. Ex. 3.)  Under Wyndham's policies, Wyndham's managers and supervisors must: (1) approve overtime work before it is performed, and both approved and non-approved overtime work must be paid; and (2) review and approve time records at the end of each pay period, and are permitted only to make authorized edits to time that accurately reflect time worked and PTO and Sick Time.  *Id.*

Wyndham maintains written timekeeping and overtime policies which are communicated to and available to Sales Reps. Its policies are found in Wyndham's Employee Handbook, in standalone polices which employees acknowledge receiving by their signature, and in its "Rules of Engagement" policy.   (Barber Dep. 23:22-24:2.)  All Plaintiffs signed copies of Wyndham's actual timekeeping policy or an acknowledgement of receiving that policy.  (Anderson Dep. Ex. 2; Bradley Dep. Ex. 3; Conklin Dep. Ex. 3; Crawford Dep. Ex. 3; Delpriora Dep. Ex. 2; Johnson Dep. Ex. 2; Linick Dep. Ex. 7; Marshall Dep. Ex. 3; Mastandrea Dep. Ex. 3; Maynard Dep. Ex. 3; McLean Dep. Ex. 2; Neely Dep. Ex. 2; Reynolds Dep. Ex. 2; Schubert Dep. Ex. 2; Smith Dep. Ex. 3; Suitt Dep. Ex. 4; Velasco Dep. Ex. 2; Weinberg Dep. Ex. 3.)

Wyndham's written policies unequivocally state that "under no circumstances should an employee begin work before clocking in" and "the Company is required to and will pay employees for all hours worked." (*See* Exhibit 4, Excerpt from Employee Handbook.) Moreover, the policy provides that "if an employee is working but not at the work site, they are expected to notify their manager in writing . . . of any hours worked." (*Id.*) Employees are also

provided a form for reporting any offsite work.  (*Id*.)  The policies define work to include "performing project assignments, checking company related email or voice mail, receiving inbound or making outbound telephone calls with owners, guests or other employees regarding work-related issues after work hours are considered time worked.  This type of work requires submission of a Timekeeping record." (*Id*.) Wyndham also informs employees that "all overtime, approved or unapproved, must be paid." (Bradley Dep. Ex. 3.)  Additionally, effective February 2014, any Sales Rep who is not clocked in for the entire tour is not eligible for commission on that tour.  (Johnson Dep. Ex. 2.)

Wyndham uses an electronic timekeeping system called WynTime.  (Barber Dep. 32:8-23.) Employees review their time in WynTime to ensure accuracy.  (*Id*.)  If the employee forgets to punch in or out or the time recorded is incorrect, the employee is required to inform their manager in writing through email or a form.  (*Id*.)  A manager may also initiate completion of a missed punch report in these circumstances.  (*Id*.)  When an employee completes a missed punch form, the employee's WynTime record is corrected to reflect the hours worked identified in the missed punch form.  (Barber Dep. 73:17-74:13.)

Wyndham provided comprehensive wage and hour training to all Sales Managers and Sales Reps.  *Id*.  Training on Wyndham's timekeeping policies is provided to new employees as part of their initial training.  (Barber Dep. 23:22-24:6.)  Since January 1, 2012, Wyndham has conducted at least seven formal training sessions at the Myrtle Beach sales locations regarding its timekeeping policies for existing Sales Reps and Sales Managers.  (BM, ¶ 11.)

 Despite this training and despite being aware of Defendant's policies prohibiting off-the-clock work, a number of Plaintiffs chose to intentionally violate Wyndham's policies and work off the clock.  For example, Gary Conklin admitted that he submitted an inaccurate missed-

punch form in order to report fewer than 40 hours on September 3, 2014 (Conklin Dep. 57:8-60:15, Conklin Dep. Ex. 4). Conklin voluntarily admitted that this was not the first time that he had manipulated his time card but it "was the only time I caught doing it." (Conklin Dep. at 59:17-23). Conklin was paid for the time that he actually worked, notwithstanding his attempt to misrepresent the hours he worked, and received written disciplinary action for submitting a false time report. (Conklin Dep. 57:8-60:20; Conklin Dep. Ex. 4). Conklin voluntarily resigned his employment shortly thereafter (Conklin Dep. 62:8-15). As Conklin explained, he was unconcerned with hourly compensation because "I'm trying to earn a commission. $7.25 don't pay." (Conklin Dep. 54:2-3). Similarly Steven Bradley testified that he knew that Wyndham's policies required him to be clocked in while he was working and that he violated those policies. (Bradley Dep. 53:17-21). Bradley testified that hourly compensation was "irrelevant" to him because he was "more concerned about working and getting deals." (Bradley Dep. 55:14-25). Sharon Linick testified that other salespeople told her to manipulate her time to avoid recording all time worked and also testified that "we were all in commission, we were there to make money. So, I mean, it [working off the clock] wasn't even a thought process until now." (Linick Dep. 108:4-16; 109:18-21). Linick also testified that there she was aware of sales representatives who sought to avoid payment of a draft because it "was a pain in the ass." (Linick 118:18-22) Mastandrea also testified that she chose not to report all of the hours she worked because she did not want to repay a draft from future commissions. (Mastandrea Dep. 190:24-191:4)

Wyndham's enforcement of its timekeeping policies is clear from the fact that Plaintiffs Delpriora, Conklin, Linick, Bradley, McLean, Marshall, Velasco, and Smith all received written corrective actions during their employment for failing to punch in and punch out. (Delpriora Dep. Ex. 6; Conklin Dep. Ex. 4; Linick Dep. Ex. 11; Bradley Dep. Ex. 9; McLean Dep. Ex. 6;

Smith Dep. Ex. 8; Marshall Dep. Ex. 17; Velasco Dep. Ex. 7.) Plaintiff Johnson testified that she received a final written warning for not being on the clock during a tour, which, according to her testimony, was the only time that she had forgotten to punch in while on tour. (Johnson Dep. 88:8-90:11.) Plaintiff Conklin also received a final written warning for working off the clock. (Conklin Dep. 59:17-60:18.) Significantly, Plaintiff Bradley was *terminated* for reasons that included working off the clock. (Bradley Dep. 182:4-23.)

## II.    LEGAL ANALYSIS

### A.    Summary Judgment Standard.

Summary judgment "is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to 'secure the just, speedy, and inexpensive determination of action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1). Summary judgment must be granted "if the pleadings, the discovery, and the disclosure of materials on file, and any affidavit show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986). The mere existence of some alleged factual dispute will not defeat summary judgment; "the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247-48. "Rule 56(e) therefore requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp.*, 477 U.S. at 274. "Mere unsupported speculation is not sufficient to defeat a summary judgment motion if the undisputed evidence indicates that the other party should win as a matter of law." *Francis v. Booz, Allen & Hamilton, Inc.*, 452 F.3d 299, 308 (4th Cir. 2006).

**B.    Plaintiffs' Time Barred Claims Should Be Dismissed.**

The FLSA provides in relevant part,

> An action to recover the liability prescribed in either of the preceding sentences may be maintained against any employer (including a public agency) in any Federal or State court of competent jurisdiction by any one or more employees for and in behalf of himself or themselves and other employees similarly situated.  **No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought**.

29 U.S.C. § 216(b) (emphasis added).  The FLSA further provides,

> [I]n the case of a collective or class action instituted under the Fair Labor Standards Act of 1938, as amended, or the Bacon-Davis Act, it shall be considered to be commenced in the case of any individual claimant--
>
> (a) on the date when the complaint is filed, if he is specifically named as a party plaintiff in the complaint and his written consent to become a party plaintiff is filed on such date in the court in which the action is brought; or
>
> (b) if such written consent was not so filed or if his name did not so appear--on the subsequent date on which such written consent is filed in the court in which the action was commenced.

29 U.S.C. § 256.  These provisions require plaintiffs to file written consents to join a lawsuit, even if named as plaintiff in the lawsuit.  *See, e.g.*, *Acosta v. Tyson Foods, Inc.*, 2015 U.S. App. LEXIS 15043, at *7-8 (publication pending) (8th Cir. Aug. 25, 2015) (holding that district court should have dismissed named plaintiff's claims as time barred because he failed to file a consent within the limitations period); *Frye v. Baptist Mem. Hosp., Inc.*, 495 Fed. Appx. 669, 675 (6th Cir. Aug. 21, 2012) ("Frye argues that the FLSA does not require named plaintiffs, such as himself, to file written consents. But the plain language of § 256(a) does."); *Albritton v. Cagle's, Inc.*, 508 F.3d 1012 (11th Cir. 2007) (affirming district court's dismissal of two lawsuits resulting from failure by named plaintiffs to comply with § 216(b) written consent to join

requirement); *Harkins v. Riverboat Serv.*, 385 F.3d 1099, 1102 (7th Cir. 2004) (stating that

requirement in § 216(b) for plaintiff to file written consent to join suit is unambiguous).

Two unpublished opinions from the Court of Appeals from the Fourth Circuit have also

interpreted § 216(b) as imposing a requirement on named plaintiffs to file written consents. In

*Royster v. Food Lion (In re Food Lion)*, 1998 U.S. App. LEXIS 11809, the court considered

whether the district court properly dismissed the claims of the six named plaintiffs as time barred

where the six named plaintiffs failed to file written consents to join. The court affirmed:

> Case authority has interpreted the statutory sections as requiring all
> plaintiffs in a collective action under the FLSA to file written
> consents for statute of limitations purposes. "Until a plaintiff, even
> a named plaintiff, has filed a written consent, []he has not joined in
> the class action, at least for statute of limitations purposes." *Songu-
> Mbriwa v. Davis Memorial Goodwill Indus.*, 144 F.R.D. 1, 2
> (D.D.C. 1992) (citing and quoting 29 U.S.C. § 256(a)) (other
> citations omitted). Moreover, signed consents filed after the filing
> of the complaint do not relate back to the date the complaint was
> filed. *Kuhn v. Philadelphia Elec. Co.*, 487 F. Supp. 974 (E.D. Pa.
> 1980), aff'd, 745 F.2d 47 (3rd Cir. 1984). Rather, each claimant's
> "action is commenced on the date on which his or her consent is
> filed with the court." 487 F. Supp. at 976.
>
> Had this action been brought simply as an individual case with
> several plaintiffs, there would have been no need for any consents
> to have been filed. The filing of a collective action under 29 U.S.C.
> § 216(b), however, renders consents necessary, and these claims
> below were brought in just such a fashion--they were brought on
> behalf of the named individuals and others similarly situated.
> Redundant though it may seem to require consents from the named
> plaintiffs in a class action, the district court did not abuse its
> discretion in ordering such consents nor in dismissing the
> appellants' claims which exceeded the limitations period when no
> consents were filed within the applicable three year period.

*Royster v. Food Lion (In re Food Lion)*, 1998 U.S. App. LEXIS 11809 at *40-41 (4th Cir.

June 4, 1998). Three years later, the Fourth Circuit reached the same result in *Lee v. Vance

Executive Protection, Inc.*, 7 Fed. App'x 160 (4th Cir. Feb. 8, 2001). In that case, two named

plaintiffs who joined as part of an amended complaint waited three months before filing

consents. The two plaintiffs argued that the lawsuit was an individual action rather than a collective action and so consent forms were not required. The court rejected this argument given that the amended complaint purported to be brought by plaintiffs "on behalf of themselves and all other employees similarly situated." *Id.* at 167.

District courts within the Fourth Circuit have also found the claims of named plaintiffs to be barred where the plaintiffs failed to timely file consents. *See, e.g., Faust v. Comcast Cable Communs. Mgmt LLC*, 2013 U.S. Dist. LEXIS 145804 at *10 (D. Md. Oct. 9, 2013) ("Thus, the Court determines that, '[u]ntil a plaintiff, even a named plaintiff, has filed a written consent, []he has not joined in the [collective] action, at least for statute of limitations purposes'"); *MacGregor v. Farmers Insurance Exchange*, 2011 U.S. Dist. LEXIS 75872 at *6 (D.S.C. July 13, 2011) (refusing to permit equitable tolling for opt-in plaintiffs who had not yet filed written consents to join in the action).[6] *See also Grayson v. K Mart Corp.,* 79 F.3d 1086, 1106 (11th Cir. 1996); *O'Connell v. Champion Int'l Corp.*, 812 F.2d 393, 394 (8th Cir. 1987); *Gjurovich v. Emmanuel's Marketplace, Inc.*, 282 F. Supp. 2d 101, 104 (S.D.N.Y 2003); *Wertheim v. Arizona*, Case No. 92-453, 1993 U.S. Dist. LEXIS 21292 (D. Ariz. Sept. 30, 1993); *Songu-Mbriwa v. Davis Mem'l Goodwill Indus.*, 144 F.R.D. 1, 2 (D.D.C. 1992); *Kuhn v. Philadelphia Elec. Co.*, 487 F. Supp. 974, 975-76 (E.D. Pa. 1980), *aff'd,* 745 F.2d 47 (3d Cir. 1984)

Here, it is clear that Plaintiffs brought this case as a collective action. The Second Amended Complaint is styled as "Plaintiffs' Second Amended Collective Action Complaint" (ECF No. 61.) In the introductory paragraph, Plaintiffs purport to bring the case "on behalf of

---

[6] In fact, Plaintiffs in this case conceded the applicability of the written consent requirement in their Memorandum in Support of their Motion for Class Certification, stating that "[t]he FLSA, 29 U.S.C. §§ 216(b) and 256, requires that the statute of limitations continue to run for a potential claimant in an FLSA collection action until he or she consents in writing to become a party plaintiff" (*citing McGregor* at *1) (ECF No. 69, p. 21).

themselves and all other employees similarly-situated." Paragraph One alleges, "Plaintiffs bring a collective action to recover unpaid overtime wages under the Fair Labor Standards Act." Paragraph 3 alleges, "Accordingly, Plaintiffs bring this action on behalf of themselves and other employees similarly-situated." Paragraph 30 alleges, "Plaintiffs file this case as an "opt-in" class action as specifically allowed by 29 U.S.C. § 216(b)." Paragraph 31 defines the class that Plaintiffs seek to represent. Paragraph 32 alleges, "Plaintiffs seek to represent only those members of the above-described group, who after appropriate notice of his ability to opt-in to this action, have provided consent in writing to be represented by Plaintiffs' counsel as required by 29 U.S.C. § 216(b)." There are no individual allegations in the Complaint, but rather the claims for relief are pled on behalf of the Plaintiffs, as a group, the Plaintiff Class, and/or "Sales Consultants." Thus, it is clear from the allegations in the Second Amended Complaint that this case is a collective action, and, thus, the consent requirements of § 216(b) apply. In fact, Plaintiffs are fully aware of the consent requirement because the last three Plaintiffs to join this case filed consents. (ECF No. 61-1, 61-2, 61-3.)

1. **Plaintiffs' claims should be dismissed to the extent that they seek recovery for any period preceding two years of filing of a valid consent in this action.**

Because it is undisputed that ten of the Plaintiffs (specifically, Steven Bradley, April McLean, Donna Weinberg, Jonathan Anderson, Richard Reynolds, Sharon Linick, Linda Neely, Joseph Schubert, Doreen Mastandrea, and William Suitt) have not worked for Wyndham during the preceding two years and no consent has been filed by them, their claims are completely barred by the FLSA's statute of limitations and should be dismissed. The only Plaintiffs who filed consents in this matter are Johnson, Velasco, and Marshall. As to all other Plaintiffs, the claims should be dismissed to the extent such claims seek recovery for any time period preceding

two years of filing a valid consent in this action.

**2. Alternatively, the Claims of Plaintiffs who have not worked for Wyndham during the preceding three years should be dismissed.**

Alternatively, and, at a minimum, the Court should dismiss the claims of Plaintiffs Reynolds, Neely, Linick, Schubert, Mastandrea, and Suitt as completely time barred even under a three-year statute of limitations.  Under the FLSA, it is the plaintiff's burden to demonstrate that they are entitled to a three-year, rather than a two-year statute of limitations.  As set forth below, Plaintiffs cannot meet that burden in this case.  Even assuming, *arguendo*, Plaintiffs could demonstrate entitlement to a three-year limitations period, the claims of Suitt, Reynolds, Mastandrea, Schubert, Neely, and Linick would nevertheless be time barred.  Again, assuming *arguendo* the three-year limitations period applies, as to all other Plaintiffs, the claims should be dismissed to the extent such claims seek recovery for any time period preceding three years of filing a valid consent in this action.

**C. Reynolds Lacks Standing to Pursue his Claims Against Defendants and This Court, Therefore, Lacks Subject-Matter Jurisdiction Over His Claims. Alternatively, Reynolds Is Judicially Estopped From Pursuing These Claims.**

Reynolds initiated this action while his bankruptcy case was pending before the Bankruptcy Court for the District of South Carolina (Case No. 13-06-285-jw).  Accordingly, Reynolds no longer has standing to pursue his claims, which must be dismissed for lack of subject matter jurisdiction.  Standing is a "threshold jurisdictional question which ensures that a suit is a case or controversy appropriate for the exercise of the courts' judicial powers under the Constitution of the United States."  *Pye v. United States*, 269 F.3d 459, 466 (4th Cir. 2001).  A court lacks subject matter jurisdiction over the claims of an individual who lacks standing. *AtlantiGas Corp. v. Columbia Gas Transmission Corp.*, 210 Fed. Appx. 244 (4th Cir. 2006).

A bankruptcy petitioner's interest in a lawsuit is part of the bankruptcy estate when the

bankruptcy case is commenced. *See, e.g., Brockington v. Jones*, No.: 4:05-3267-RBH-TER, 2007 U.S. Dist. LEXIS 96248, at *8-9 (D.S.C. Nov. 28, 2007). This is true even if the cause of action is not disclosed by the petitioner. *Id.* at *8. Once a cause of action becomes part of the bankruptcy estate, "then the trustee alone has standing to bring that claim." *Nat'l Am. Ins. Co. v. Ruppert Landscaping Co.,* 187 F.3d 439, 441 (4th Cir. 1999), *cert. denied*, 528 U.S. 1156 (2000) (citing *Steyr-Daimler-Puch of Am. Corp. v. Pappas*, 852 F.2d 132, 136 (4th Cir. 1988)).

Reynolds' interest in this litigation became the property of the bankruptcy estate "the moment [he] filed [his] bankruptcy petition." *Whitten v. Fred's, Inc.*, Case No. 8:08-0218-HMH-BHH, 2010 U.S. Dist. LEXIS 70267 (D.S.C. July 12, 2010). Moreover, because Reynolds failed to disclose this case as an asset in the bankruptcy petition or schedule of assets, his interest in this case was not exempt from the estate or abandoned by the trustee. *See Miller v. Pac. Shore Funding*, 287 B.R. 47, 50-52 (D. Md. 2002). Accordingly, Reynolds' claims belong to the bankruptcy trustee, and only the trustee has standing to pursue his claims in this case. Accordingly, Reynolds' claims must be dismissed for lack of subject matter jurisdiction.

Reynolds is also barred from pursuing his claims by the doctrine of judicial estoppel. "Judicial estoppel is a principle developed to prevent a party from taking a position in a judicial proceeding that is inconsistent with a stance previously taken in court." *Brockington*, 2007 U.S. Dist. LEXIS 96248, at *10 (quoting *Zinkand v. Brown*, 478 F.3d 634, 638 (4th Cir. 2007)). The doctrine is "designed to prevent the inconsistent party from 'playing fast and loose' with the courts, and to protect the essential integrity of the judicial process." *Allen v. Zurich Ins. Co.,* 667 F.2d 1162, 1167 (4th Cir. 1982).

Reynolds was aware of his claims because he has submitted an affidavit, dated July 2, 2012, describing his claim. (ECF No. 69-1 at 5.) This affidavit was completed more than a year

*before* he filed for bankruptcy. Moreover, he had the requisite motivation to conceal his claims because, by doing so, he stood to increase the amount of his disposable assets in bankruptcy. *Brockington*, 2007 U.S. Dist. LEXIS 96248, at *12 (citing *DeLeon v. Comcar Indus., Inc.*, 321 F.3d 1289, 1291 (11th Cir. 2003)).

Reynolds further failed to properly amend his petition when he initiated this action. "The debtor's duty to disclose potential claims as assets does not end when the debtor files schedules, but instead continues for the duration of the bankruptcy proceedings." *In re Family Dollar FLSA Litig.*, 2009 U.S. Dist. LEXIS 52109, * 19 (W.D.N.C. June 19, 2009) (quoting *Hamilton v. State Farm Fire & Cas. Co.*, 270 F. 3d 778, 785 (9th Cir. 2001); *see also, McCoy v. Am. Union Boiler Co.*, 2006 U.S. Dist. LEXIS 14781, at * 6 (S.D.W.V. May 14, 2006); *Jethroe v. Omnova Solutions, Inc.*, 412 F.3d 598, 600 (5th Cir. 2005).

District courts within the Fourth Circuit have routinely applied the doctrine of judicial estoppel when plaintiffs have failed to disclose a claim in bankruptcy proceedings. *See, e.g., In re Family Dollar,* 2009 U.S. Dist. LEXIS 52109, at * 15-20 (applying judicial estoppel to claims by plaintiffs who opted-in to FLSA litigation both before and after they filed bankruptcy petitions); *accord Pappacoda v. Palmetto Health,* Case. No. 3:13-cv-01995-JFA, 2014 U.S. Dist. LEXIS 124934, at *5-9 (D.S.C. Sept. 8, 2014); *Thomas v. Palmetto Mgmt Servs*, Case No. 3:05-17-CMC-BM, 2006 U.S. Dist. LEXIS 64770 (D.S.C. Sept. 11, 2006); *Arbugast v. Well Fargo Auto Fin., Inc.*, No. 2:09-cv-49, 2009 U.S. Dist. LEXIS 97815, * 12 (N.D. W.Va. Oct. 21, 2009). Reynolds' claims should, therefore, be dismissed.

### D.    The Court Should Grant Wyndham's Motion For Summary Judgment On All Claims Outside Of The Two-Year Statue Of Limitations.[7]

---

[7] Only Larry Marshall, Michelle Johnson, and Edmundo Velasco have filed consents in this action. Michelle Johnson worked for Wyndham from September 16, 2013, through April 20, 2015, and none of her claims fall outside of the two-year statute of limitations period. (Johnson

The FLSA provides two different statutes of limitations depending upon the nature of the alleged violation. 29 U.S.C. § 255(a). A two-year statute of limitations applies to ordinary violations of the FLSA. *Id.* If the employee proves that the violation was willful, a three-year statute of limitations applies. *Id.* An employee seeking the benefit of the three-year statute of limitations bears the burden of proving by a preponderance of the evidence that the employer's alleged violation of the FLSA was willful. *See Desmond v. PNGI Charles Town Gaming, L.L.C.,* 630 F.3d 351, 358 (4th Cir. 2011) *(citing McLaughlin v. Richland Shoe Co.,* 486 U.S. 128, 135 (1988)); *see also Garcia v. Frog Island Seafood, Inc.,* No 2:06-CV-46-F, 2009 U.S. Dist. LEXIS 54718, at *41-42 (E.D.N.C. June 29, 2009) (summary judgment dismissing willfulness claim); *De Jesus De Luna-Guerrero v. N.C. Grower's Ass'n,* 370 F. Supp. 2d 386, 388 (E.D.N.C. 2005) (summary judgment dismissing willfulness claim). In a collective action such as this, the statute of limitations is measured back from the date each plaintiff files his or her consent to become a party to the action. *See* 29 U.S.C. § 257.  <u>Royster</u>, 1998 U.S. App. LEXIS 11809 at *40-41; <u>Lee</u>, 7 Fed. App'x. at 160; <u>MacGreger</u>, 2011 U.S. Dist. LEXIS 75872 at *6; <u>See also</u>, <u>Acosta</u> 2015 U.S. App. LEXIS 15043 at *7-8; <u>Grayson,</u> 79 F.3d at 1106; <u>O'Connell</u>, 812 F.2d at 894.

An employee seeking the benefit of the three-year statute of limitations bears the burden of proving by a preponderance of the evidence that the employer's alleged violation of the FLSA was willful. *McLaughlin,* 486 U.S. at 135; *Desmond*, 630 F.3d at 358. In *McLaughlin,* the Supreme Court held that, in order to prove that an employer's conduct amounted to a willful violation of the FLSA such that the three year statute of limitations applies, the plaintiff must

---

Dep. 15:18-24.)  Marshall and Velasco, however, have asserted claims outside of the standard two-year limitations period.  All other Plaintiffs have failed to file consents as required by Section 216(b), and, to the extent they seek to assert claims for any time period more than two years preceding the filing of a valid consent in this action, such claims should be dismissed.

establish that "the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by" the FLSA. *McLaughlin*, 486 U.S. at 133, 135. In so doing, the Court expressly rejected the Fifth Circuit's *Jiffy June* standard – which required only a finding that "an employer knew that the FLSA 'was in the picture[,]'" – because such a standard "virtually obliterate[d] any distinction between willful and nonwillful violations." *Id.* at 132-33.

The Court went on to explain that even proof of unreasonable conduct by the employer is insufficient to prove willfulness and trigger the three year limitations period:

> If an employer acts reasonably in determining its legal obligation, its action cannot be deemed willful . . . . If an employer acts unreasonably, but not recklessly, in determining its legal obligation, then . . . it should not be [] considered [willful] under <u>Thurston</u> or the identical standard we approve today.

*McLaughlin,* 486 U.S. at 135 n.13. The Court further noted that the term willful "is considered synonymous with such words as voluntary,' deliberate,' and intentional'" and "is generally understood to refer to conduct that is not merely negligent." *Id.* at 133. Thus, to prove willfulness and take advantage of the three year limitations period, a plaintiff must prove knowledge or recklessness by of the employer, not mere negligence or unreasonable conduct.

The United States Court of Appeals for the Fourth Circuit has interpreted the *McLaughlin* standard as requiring that an employer have "an actually malignant – not merely careless – mental state" in order for the three year statute of limitations to apply. *Chao v. Self Pride, Inc*., 232 Fed. Appx. 280, 287 (4th Cir. May 17, 2007). In *Chao,* the Fourth Circuit upheld the district court's finding that the employer's conduct did not amount to a willful violation of the FLSA. *Id.* at 286-87. The Fourth Circuit noted that the district court could have determined that the defendants had a reasonable disagreement with the Department of Labor concerning their legal obligations or that the defendants were neglectful in learning their legal obligations, which would

be insufficient to support a finding of willfulness. *Id.* Accordingly, the Fourth Circuit affirmed the district court's application of the two year statute of limitations. *Id.* Thus, a reasonable belief by the employer that its actions did not violate the FLSA would not support a finding of willfulness even if the employer's belief was neglectful or negligent.

Moreover, willfulness is often decided on summary judgment. *See Garcia v. Frog Island Seafood, Inc.,* No 2:06-CV-46-F, 2009 U.S. Dist. LEXIS 54718, at *41-42 (granting employer's motion for summary judgment on willfulness); *Williams v. Md. Office Relocators*, LLC, 485 F. Supp. 2d 616, 621 (D. Md. 2007) (granting employer's motion for summary judgment on willfulness because evidence that the employer thought the FLSA issue was complex and confusing was insufficient to demonstrate willfulness and "[p]roof of willfulness must be far stronger, such as evidence that the defendant had previously been investigated for FLSA violations, or evidence of a scheme by the employer to cover-up FLSA violations"); *De Jesus De Luna-Guerrero,* 370 F. Supp. 2d at 390 (granting employer's motion for summary judgment on willfulness); *see also Houston v. URS Corp.,* 591 F. Supp. 2d 827, 835 (E.D. Va. 2008) ("[W]hether a violation is willful is a factual issue often addressed on summary judgment . . .").

Wyndham expects Plaintiffs to argue that Wyndham acted willfully because a handful of lower level supervisors allegedly instructed some Plaintiffs to work off the clock and allegedly altered time records of other Plaintiffs to keep their hours below 40. However, it is the actions of a few rogue managers are insufficient to establish that Wyndham acted willfully, particularly in light of the fact that Wyndham has policies against working off the clock and it enforces those policies to the point of terminating one of the Plaintiffs, Steve Bradley, for working off-the-clock. Moreover, since February 2014, Sales Reps who are not on the clock during a tour are ineligible for commission from that tour. (Johnson Dep. Ex. 2.)

The case of *Reich v. Newspapers of New England*, 44 F.3d 1060 (1st Cir. 1995) makes clear that Wyndham has not willfully violated the FLSA. In that case, the plaintiffs argued that a three-year rather than a two-year statute of limitations should apply to their claims because:

> [S]everal employees testified that they had been instructed by superiors to report no more than forty hours on their weekly timecards. Those employees also testified that they were occasionally reprimanded when they did report overtime and were told to alter their weekly timecards so that no overtime hours would be included.

*Reich*, 44 F.3d at 1080.    Notwithstanding this evidence, the First Circuit affirmed the trial court's decision which found that the newspaper had not willfully violated the FLSA because the newspaper had paid its employees for all reported time, including all overtime. Similarly in *Reich v. Gateway Press*, 13 F.3d 685, 702 (3rd Cir 1994) the plaintiffs alleged that they were told not to record more than 40 hours on their time slips, that they were reprimanded if they did so and that, in one case, a manager threatened to fire an employee if he refused to revise his time slip to reflect only 40 hours worked. The court also found, however, that "in many of these cases, employees themselves, and without prompting, filled out their time slips inaccurately…" (*Id.* at 702). The Third Circuit found that "it would be unfair to use evidence that mainly indicates that the [employees] were committed to their jobs as proof of [the employers] willful violation of the FLSA." (*Id.*) Here, Wyndham has not only paid Plaintiffs for all hours they reported, including hundreds of overtime hours, but it has also disciplined Plaintiffs who worked off the clock. Plaintiffs cannot show that Wyndham acted willfully and, thus, a two-year statute of limitations applies.

The evidence in the record is insufficient as a matter of law to show that Wyndham acted with malignant intent. To the contrary, the record contains significant evidence of Wyndham's efforts to mandate and ensure compliance with the FLSA. Wyndham has a policy prohibiting

off-the-clock work, it provides regular training on that policy, and it strictly enforces that policy. (See ECF No. 80-4; Barber Dep. 23:22-24:6; BM, ¶ 11.)  Eight Plaintiffs received written discipline for violating Wyndham's policies (see page 8 above).  Plaintiffs Conklin and Johnson received final written warnings for working off-the-clock, and Plaintiff Bradley was terminated for violating Wyndham's timekeeping policy.  (Johnson Dep. 88:8-90:11; Conklin Dep. 59:17 – 60:18; Bradley Dep. 182:4-23).  The alleged violations in this case are based on Plaintiffs' admittedly willful violations of Wyndham's policies.  (Conklin Dep. 57:8-60:20; Ex. 4; Bradley Dep. 53:17-21; 55:14-25).  Plaintiffs testified that they willfully disregarded Wyndham's timekeeping policy because they were interested in making sales and earning commissions, not minimum wage in the form of a draw.  (Conklin Dep. 54:2-3; Bradley Dep. 53:14-25; Linick Dep. 108: 4-16, 109:18-21, 118:18-22; Mastandrea Dep. 190:24-191:14).  Such evidence cannot demonstrate the malignant state of mind that the Fourth Circuit states must be proved in order to establish a willful violation.

In addition, in *Perez v. Mountaire Farms, Inc.,* the court found that the evidence of willfulness offered by the plaintiff –was insufficient to establish willfulness under the *McLaughlin* standard. *Perez v. Mountaire Farms, Inc.,* 610 F. Supp. 2d 499, 525-27 (D. Md. 2009).  The court stated that "the legal landscape is not yet clearly defined in FLSA donning and doffing cases" and that "[d]ifferent circuits have approached donning and doffing cases differently."  *Id.* at 526. The court distinguished between "acts and policies that amount to reckless disregard for clear legal principles[,]" which amount to willfulness, and "acts and policies intended to avoid liability in the face of changing legal standards[,]" which do not amount to willfulness. *Id.*  The court determined that Mountaire's actions were "intended to avoid liability" in the midst of "continued litigation as to the proper legal standards for donning

and doffing cases," and, therefore, Mountaire's actions did not amount to willful conduct. *Id.* at 526-27; *see also De Jesus De Luna-Guerrero,* 370 F. Supp. 2d at 390 (granting the employer's motion for summary judgment on the issue of willfulness and noting that "the violation found in this case is a matter of first impression in this circuit and has only been decided directly by one other circuit court in the United States"). *McIntyre v. Div. of Yough Rehab. Servs.*, 795 F. Supp. 668 (D. Del. 1992) [*12] (violation not willful when employer believed plaintiff was covered by administrative exemption); *Hilbert v. District of* Columbia, 784 F. Supp. 922 (D.D.C. 1992), aff'd in part, rev'd in part on other grounds, 306 U.S. App. D.C. 121, 23 F.3d 429 (D.C. Cir. 1994) (violation not willful when the employer did not thwart settled law or recklessly disregard pertinent legal questions). *Reich v. Gateway* Press, 13 F.3d at 702-703 ("this case presents not only close questions of law and fact, but also a case of first impression with respect to one of the governing exemptions notwithstanding that has been on the books for 55 years.") *Hanover v. Carteret Mortgage Corp*, 2008 U.S. Dist. LEXIS 89706 at *11 (M.D. Pa 2008) ("When an employer is simply mistaken about the terms of the FLSA, however, courts general find that such a violation, albeit negligent, is not willful.") Thus, where the evidence shows that the employer attempted to determine its obligations amidst conflicting judicial standards and a lack of clarity as to the requirements of the FLSA, the evidence is insufficient to show that the employer willfully violated the FLSA. As discussed in Section II.E below, the question of whether timeshare sales representatives such as Plaintiffs are exempt from the FLSA pursuant to Section 7(i) is an unresolved question of law. In fact, only two district court opinions have addressed the issue. As in *Mountaire Farms* and *De Jesus De Luna-Guerrero,* the applicability of the 7(i) exemption presents unresolved legal issues for which there is no precedent in the

Fourth Circuit.[8]

In summary, the Plaintiffs, who admitted to willfully violating Wyndham's policies cannot establish a willful violation by Wyndham. Wyndham's efforts to comply with the FLSA, Plaintiffs own willful disregard of Wyndham's policies, and the unresolved application of 7(i) to the Plaintiffs, show the lack of any evidence by which Plaintiffs could satisfy their burden of proof and show that Wyndham had a malignant state of mind when it created, implemented and applied its policies. As such, the two-year limitations period should apply in this case, and the Court should dismiss any and all claims of each Plaintiff which are based upon alleged violations which occurred more than two years before that Plaintiff filed his or her consent to join the case.

### E. Wyndham Is Entitled to Summary Judgment Because Plaintiffs Are Exempt from The Requirements of The FLSA Under Section 7(i).

Wyndham is also entitled to summary judgment as to those weeks in which Plaintiffs meet the requirements for the Section 7(i) exemption. As discussed below, Wyndham meets the two of the three requirements for 7(i) as to all Plaintiffs for all weeks of their employment: (1) Wyndham is engaged in retail sales and (2) at least half of the Plaintiffs' income comes from commissions. In addition, the third and final requirement—the Plaintiffs earn at least 1.5 times minimum wage each week—is also met for many weeks of employment for all Plaintiffs.[9]

#### 1. The FLSA Was Never Intended To Cover Plaintiffs.

---

[8] Prior to a Department of Labor Opinion letter issued in 2007 many timeshare representatives were considered as exempt under the outside sales exemption. Department of Labor, Wage and House division, Op. Letter, FLSA 200 7-4 2007 DOLWH, LEXIS 4 (January 25, 2007). Since that time, the applicability of the more specific 7(i) exemption has not been resolved.

[9] The applicability of the 7(i) exemption to timeshare sales representatives is an unresolved issue. No circuit court has addressed the issue. The statutory language of the 7(i) exemption and the regulations both predate the concept of timeshare sales in the United States which did not exist until the 1970s. *See* Mary Lou Savage, *Time Share Regulation: The Wisconsin Model*, 77 Marq. L. Rev. 719 (1994) (discussing historical development of timeshare industry). The applicability of 7(i) to timeshare salespersons is an issue of first impression for this Court.

"Congress enacted the FLSA in 1938 with the goal of 'protect[ing] all covered workers from substandard wages and oppressive working hours.'" *Christopher v. SmithKline Beecham Corp.*, 132 S. Ct. 2156, 2162 (2012) (quoting *Barrentine v. Arkansas-Best Freight System, Inc.*, 450 U. S. 728, 739, 101 S. Ct. 1437, 67 L. Ed. 2d 641 (1981)). The Legislative History of the FLSA, as summarized by the Seventh Circuit, suggests a threefold purpose for the FLSA's overtime requirement:

> The first purpose was to prevent workers willing (maybe out of desperation, though this is no longer very likely) to work abnormally long hours from taking jobs away from workers who prefer to work shorter hours. In particular, unions' efforts to negotiate for overtime provisions in collective bargaining agreements would be undermined if competing, non-union firms were free to hire workers willing to work long hours without overtime. The second purpose was to spread work and thereby reduce unemployment, by requiring an employer to pay a penalty for using fewer workers to do the same amount of work as would be necessary if each worker worked a shorter week. The third purpose was to protect the overtime workers from themselves: long hours of work might impair their health or lead to more accidents (which might endanger other workers as well).

*Mechmet v. Four Seasons Hotels, Ltd.*, 825 F.2d 1173, 1176 (7th Cir. 1987). The FLSA was not created (or amended) to provide highly compensated commissioned salespersons with additional compensation. As two of the committee members recognized when the FLSA was amended to eliminate the complete exemption for retail and service establishments and to add the 7(i) exemption:

> [M]any high commission employees work long hours during peak periods. To require the payment of overtime on such high commissions would result in fantastic payments during periods of heavy selling. The committee bill takes partial cognizance of this problem [by retaining the exemption for certain commissioned salespersons] but it does not fully meet it."

*See* S. Rep. No. 145, at 266 (1961), *reprinted in* Legislative History of the Fair Labor Standards

Amendments of 1961 (1963).  As developed below, the policy interests underlying the FLSA

support a finding that Plaintiffs are exempt from the Act's coverage pursuant to Section 7(i).

> 2.    Section 7(i) Exempts Certain Commissioned Salespersons in Retail or Service
> Establishments from The Overtime And Minimum Wage Requirements of
> The FLSA.

Section 7(i) of the FLSA exempts from the FLSA's overtime requirements "any

employee of a retail or service establishment . . . if (1) the regular rate of pay of such employee is

in excess of one and one-half times the minimum hourly rate applicable to him under section 6

[the minimum wage section] of this title, and (2) more than half his compensation for a

representative period (not less than one month) represents commissions on goods or services."

29 U.S.C. § 207(i).  Thus, to qualify for Section 7(i)'s exemption from the overtime provisions

of the FLSA, three conditions must be met:

(1)    The employee must be employed by a "retail or service establishment" within the

meaning of section 7(i);

(2)    The employee's regular rate of pay must exceed one and one-half times the

applicable minimum wage; and

(3)    More than half the employee's total earnings in a representative period must

consist of commissions on goods or services.

*Alvarado v. Corporate Cleaning Servs.*, 782 F.3d 365, 366 (7th Cir. 2015).  *See also Martin v.

Refrigeration School, Inc.*, 968 F.2d 3, 5 (9th Cir. 1992) ("Retail establishments, however, are

exempt from [the overtime] requirement as to employees whose regular rate of pay is 150

percent of the minimum hourly rate and who receive more than half his compensation by way of

commissions"); *Mechmet v. Four Seasons Hotels, Ltd.*, 825 F.2d 1173, 1174 (7th Cir. 1987)

(explaining that the FLSA's overtime and minimum wage requirements "do not apply to

employees of 'a retail or service establishment' if the employee's regular rate of pay is more than 1.5 times the minimum wage and if 'more than half his compensation for a representative period (not less than one month) represents commissions on goods or services'").   As discussed below, there is no dispute that for at least a significant number of weeks of their employment, Plaintiffs satisfy each of these requirements, and, as a result, they are exempt from the overtime and minimum wage requirements of the FLSA during such weeks.

### a.   Wyndham Vacation Resorts is A Retail Or Service Establishment.

Wyndham satisfies the first requirement for the 7(i) exemption because it is a retail or service establishment.   As a preliminary matter, the "determination of whether Defendant's business is a retail or service establishment is a matter of statutory construction and is thus a question of law to be determined by the Court."   *Selz v. Investools, Inc.*, 2011 U.S. Dist. LEXIS 9364 (D. Utah Jan. 27, 2011) (citing *Schoenhals v. Cockrum*, 647 F.2d 1080, 1081 (10th Cir. 1981)).   Section 7(i) does not define retail or service establishment, and so courts have relied on the definition of "retail or service establishment," which was contained in the now repealed Section 13(a)(2) of the FLSA.   *See, e.g., Gieg v. DRR, Inc.*, 407 F.3d 1038, 1047 (9th Cir. 2005); *Reich v. Delcorp, Inc.*, 3 F.3d 1181, 1183 (8th Cir. 1993).

The regulations enacted pursuant to Section 13(a)(2) both define and provide examples of retail or service establishments.[10]   Broadly speaking, to qualify as a retail or service

---

[10] These regulations should not be blindly applied, however, in the context of Section 7(i).   As Judge Posner recently explained, "The Department of Labor and some courts . . . have woodenly ported the definition from section 213(a)(2) to the commission exception with no sensitivity to the very purpose of that exemption," which he defines as the inability to work steady, regular hours the year.   *Alvarado*, 782 F.3d 365 at *9, 16.   This is particularly true here because timeshares did not exist in the United States at the time these regulations were enacted in 1971. *See* David A. Bowen, *Timeshare Ownership: Regulation and Common Sense*, 18 Loy. Consumer L. Rev. 459, 461 (2006) (noting that timeshare concept spread to the U.S. in the 1970's).

establishment: (1) Wyndham must engage in the sale of goods or services; (2) at least 75% of the annual dollar volume of sales of goods or services must not be for resale; and (3) the sales must be recognized as retail sales or service in the particular industry.  29 C.F.R. § 779.313 (2015). The regulations further provide that a retail or service establishment performs a function that is at the "very end stream of distribution, disposing in small quantities of the products and skills of such organization and does not take part in the manufacturing process."  29 C.F.R. § 779.318.  It must also be open to the general public.  29 C.F.R. § 779.319.  The regulations include a partial list of establishments that have a "retail concept" as well as a list of those that do not.  *See* 29 C.F.R. §§ 779.317, 779.320.  The sale of timeshare interests is not included on either list, but, hotels are included in the list of establishments that have a retail concept.  *See* 29 C.F.R. §§ 779.318, 779.320.  There can be no serious dispute that Wyndham satisfies requirements 1 and 2 of 29 C.F.R. § 779.313.  The argument that Wyndham cannot satisfy the third condition is based on dated regulations that pre-date the existence of timeshare sales in the United States.

The Court of Appeals for the Fourth Circuit has not addressed the scope of the § 7(i) exemption, but the court has examined the meaning of retail or service establishment under former § 13(a)(2).  The court has adopted the guidance from the regulations as the law within the Fourth Circuit as to claims under former § 13(a)(2):

> Typically a retail or service establishment is one which sells goods or services to the general public. It serves the everyday needs of the community in which it is located. The retail or service establishment performs a function in the business organization of the nation which is at the very end of the stream of distribution, disposing in small quantities of the products and skills of such organization and does not take part in the manufacturing process. * * * Such an establishment sells to the general public its food and drink. * * * It provides the general public its repair services and

Moreover, as discussed further below, the vacation points sold by Wyndham are much different than the traditional concept of a time share interest.

> other services for the comfort and convenience of such public in the course of its daily living.

*Hodgson v. Centralized Services, Inc.*, 457 F.2d 824, 827 (4th Cir. 1972) (*citing* 29 C.F.R. § 779.318) (omissions in original).  Applying this guidance, the Fourth Circuit has found that a wide range of businesses from trash collectors to tax return preparers fall within the scope of the exemption.  *See Wirtz v. Modern Trashmoval, Inc.*, 323 F.2d 451 (4th Cir. 1963) (holding that a employees of trash removal company are exempt as employees of a retail or service establishment); *Hodgson*, 457 F.2d at 827 (concluding that business that prepares tax returns is a retail or service establishment).  In contrast, the court has refused to apply the exemption to a private university, *Hodgson v. Duke University*, 460 F.2d 172, 176 (4th Cir. 1972), and a private medical clinic, *Shultz v. Nalle Clinic*, 444 F.2d 17, 20 (4th Cir. 1971). *See also Hodgson*, 460 F.2d 172, 174 (collecting cases and citing as examples businesses that lack a retail concept including, loan company, producer of potato processing equipment and medical clinic).

Applying the principles from the regulations and the relatively sparse case law makes clear that Wyndham is a retail or service establishment.  Wyndham sells vacation packages, in small quantities to the general public.  These packages are bought by the end consumer to use for his or her own personal enjoyment.  Accordingly, and, as discussed further below, Wyndham is engaged in the retail sale of goods and services.

i.    <u>Wyndham is engaged in the sale of goods or services</u>.

Wyndham Vacation Resorts is in the business of selling vacation packages to consumers. (BM ¶ 3.)  Some of those packages are sold in the form of vacation points by IH and FL Reps, while others are sold in the form of trial vacation packages by Disco Reps.  (WR ¶ 3) Wyndham's vacation products are available to the general public.  At Wyndham's Sales Center, customers may walk in, sign up for a tour, learn about Wyndham's products, and then purchase a

vacation package.  (WR ¶ 4)  The process itself is not unlike the process of purchasing a car, and car salespeople have long been recognized as exempt pursuant to Section 7(i).  *See, e.g., Gieg v. DRR, Inc.*, 407 F.3d 1038 (9th Cir. 2005) (concluding that not only salespersons but also commissioned finance officers of car dealerships are exempt under 7(i)); 29 C.F.R. § 779.320 (listing automobile dealerships among those whose sales and services are recognized as retail).[11] For example, just as one would walk into a car lot and meet with a salesperson to view the inventory on the lot, one may walk into the Sales Center and meet with a Sales Rep to learn about the different vacation packages available to purchase.  Just as at a car dealership, sales managers are available to answer questions that the Sales Rep may not be able to answer.

Though one cannot "test drive" a vacation package, Sales Reps often take guests on tours of one of the resorts and also share videos, pictures, and other details of Wyndham's other resorts.  ([https://www.clubwyndham.com/cw/resorts.page](https://www.clubwyndham.com/cw/resorts.page) (last visited August 28, 2015).) When a guest decides to purchase a vacation package, as is the case when buying a car, there is a finance department, which consists of quality assurance and contracts personnel who check credit and who make sure that the purchase documents are properly executed.  The packages purchased range from $1,000 to over $30,000, and, as such, Wyndham's vacation packages are "big ticket" items that the retail sales exemption was created to cover. *See* 29 C.F.R. 779.414.

### ii.     Wyndham's Business Has A Retail Concept.

As the above description makes clear, Wyndham's business has a retail concept.  Customers may walk into Wyndham's Sales Center, meet with a Sales Rep and browse the various vacation packages Wyndham is offering for sale before deciding whether and what to purchase.  Wyndham also serves the everyday needs of the community by providing vacation

---

[11]  In fact, at least three of the Plaintiffs have been employed as car salespersons during their careers. (Conklin Dep. 11:24-12:19; Anderson Dep. 14:11-18; Velasco Dep 14:21-15:11.)

packages for sale to the general public.  Wyndham does not have to sell a product that gets used

daily by consumers to be covered by the exemption.  As one court explained in a very similar

case,

> The regulation stating that a retail or service establishment must
> serve the everyday needs of the community should not be
> interpreted to mean that such establishment must be used by
> everyone in the community on a daily basis. The list provided in
> the regulations of businesses which are recognized as retail reflects
> that such narrow interpretation would be incorrect. This list
> includes billiard parlors, bowling alleys, cemeteries, coal yards,
> crematories, dance halls, embalming establishments, funeral
> homes, for repair and storage shops, hotels, masseur
> establishments, recreational camps, taxidermists, theatres, and
> undertakers, none of which would be used daily by everyone in the
> community.

*Reich v. Cruises Only, Inc.*, 1997 U.S. Dist. LEXIS 23727 at *11 (M.D. Fl. June 4, 1997*); see

also Wells v. Taxmasters, Inc.*, 19 Wage & Hour Cas. 2d (BNA) 1266, 2012 U.S. Dist. LEXIS

133825 at *18 (S.D. Tex. Sept. 18, 2012) ("It is not the case that an establishment must provide a

product or service used by each member of the community on daily basis for it to serve the

everyday needs of the community").

    In *Reich*, Cruises Only was a business that assisted consumers in selecting and

purchasing cruise vacations.  Much like Wyndham's Sales Reps, the salespeople for Cruises

Only "inquire from the customer the type of cruise the customer desires, inform the customer of

the available cruise options, and assist the customer in booking the cruise."  *Reich,* 1997 U.S.

Dist. LEXIS 23727 at *2.  The court found that Cruises Only sold its services to the general

public and it served the everyday needs of the community because "[t]ravel agencies have

become a common and convenient method of organizing an entire vacation package at one

location."  *Id.* at *11-12.  The court also held that Cruises Only was at the end of the stream of

distribution and disposed in small quantities of its products and skills, did not take part in the

manufacturing process, and provided a service to the general public because travel agencies provide the service of convenience to customers in arranging a travel package. *Id*. at *12-16. Applying the guidance from the regulations, the court concluded that Cruises Only "fits within all of the regulations for a service establishment under the Act and possesses a retail concept." *Id.* at *16. Accordingly, the court granted Cruises Only's motion for summary judgment on the 7(i) exemption. Similarly, Wyndham is engaged in selling vacation packages to the general public and serves the everyday vacation needs of the community. The vacation packages that it sells are disposed of in small quantities at the end of the stream of distribution. Thus, for the same reasons discussed in *Reich*, Defendant's Motion should be granted.

Defendants are aware of two district courts in other circuits that have distinguished the district court's analysis in *Reich* and have declined to apply the 7(i) exemption to timeshare salespeople. *See Davidson v. Orange Lake Country Club, Inc.*, 2008 U.S. Dist. LEXIS 6420 (M.D. Fl. Jan. 29, 2008);[12] *Williams v. Trendwest Resorts, Inc.*, 2007 U.S. Dist. LEXIS 62396 (D. Nev. Aug. 20, 2007). Both of these cases ignored the overarching purpose of the retail or service exemption as embodied in the regulations, and, as such, were wrongly decided and should not be followed by this Court. In both *Davidson* and *Williams*, the district courts concluded that the two timeshare companies at issue lacked a retail concept because they sold real estate interests. The courts based their conclusions on the fact that the regulations listed "real estate companies" as among those businesses that typically lack a retail concept. *See Davidson*, 2008 U.S. Dist. LEXIS 6420 at *16; *Williams*, 2007 U. S. Dist. LEXIS at *24-25.

---

[12] The *Davidson* court did not decide as a matter of law that timeshare salespersons do not qualify for the 7(i) exemption, but rather found that the defendants failed to establish entitlement to the exemption as a matter of law. Its order did not foreclose the defendants from presenting evidence at trial that the defendant's business had a retail concept. *Davidson v. Orange Lake Country Club, Inc.*, 2008 U.S. Dist. LEXIS 15704 at *n.7 (M.D. Fl. Feb. 29, 2008).

The Fourth Circuit, however, has rejected such a rigid reading of the regulations and has instead advised courts to apply a realistic reading of the basic criteria set forth in the regulations to the activities of the business.  *See Hodgson v. Centralized Services, Inc.*, 457 F.2d 824, 827 (4th Cir. 1972) (rejecting argument that tax preparation firm was equivalent to an "accounting firm" for purposes of the regulations and warning against broad reading of those categories of businesses lacking a retail concept); *Wirtz v. Modern Trashmoval, Inc.*, 323 F.2d 451 (4th Cir. 1963) ("Although it is not specified in the legislative history as a typical retail business, we feel that trash removal qualifies for that classification.  Taking a very practical view, which is said to be the proper criterion in these cases [leads to the conclusion that trash collection business is retail]").  *Wells v. TaxMasters, Inc.* provides a more recent example of the principles that the Fourth Circuit announced in *Hodgson.  Wells*, 2012 U.S. Dist. LEXIS 133825; 19 Wage & Hour Cas. 2d (BNA) 1266, (S.D. Tex. Sept. 18, 2012).  Taxmasters was in the business of providing tax return preparation and related services to the general public, and it employed tax consultants who acted as salespersons and sold the businesses services.  *Id.* at *5.  The plaintiffs in *Wells*, like the plaintiffs in *Davidson* and *Williams*, argued that the 7(i) exemption did not apply to them because Taxmasters was engaged in "tax services," which is included in the list of businesses that typically lack a retail concept.  *Id.* at *15.  The *Wells* court rejected this argument and granted Taxmasters' motion for summary judgment on the 7(i) exemption:

> The summary judgment evidence before the Court indicates that Defendants provided not only tax preparation services that each member of the community may well utilize, but also tax dispute services to address issues that may, in some instances, arise in the course of filing taxes. Doc. 64-1 at 7-8. . . . Such certain, but periodic, services are no less retail in nature than the sale of "automobiles, . . . radios and refrigerators," or the "incidental services on such goods when necessary." 29 C.F.R. § 779.318. Defendants' tax resolution services clearly were "services for the comfort and convenience of such public in the course of its daily living." *Id.*

33

*Id.* at *20.  In other words, the *Wells* Court looked at the regulations in their entirety rather than trying to fit the employer's business into one of the categories of businesses listed in the regulations as either having or not having a retail concept.

Earlier this year, the Seventh Circuit further discredited the decades-old regulatory list of businesses lacking a retail concept.  In that case, Judge Posner criticized the Department of Labor for its blind reliance on the regulations:

> The Department seems obsessed with its incomplete, arbitrary, and essentially mindless catalog of sellers lacking "a retail concept" . . . . The [plaintiffs'] brief cites departmental regulations that attempt to define a "retail or service establishment" by listing factors of dubious relevance, such as that "75 per centum of [its] annual dollar volume of sales of goods or services (or of both) is not for resale and is recognized as retail sales or services in the particular industry," 29 C.F.R. § 779.312, or that the establishment "serves the everyday needs of the community in which it is located." 29 C.F.R. § 779.318. We don't see the connection between these criteria and the reasons for excusing certain employers from the overtime provision of the Fair Labor Standards Act.

*Alvarado*, 782 F.3d at 371.  As in this case, the employer in *Alvarado*, a commercial window washer, did not fit neatly into one of the listed categories of businesses either having or lacking a retail concept.  Rather than try to force the employer into one of those categories, the Seventh Circuit looked at the underlying purpose of the § 7(i) exemption and found that it applied to commercial window washers because their work was seasonal, requiring irregular hours and because they were paid on commission. *Id.* at 368, 371.

All of the reasons the *Alvarado* Court cited for applying the 7(i) exemption to the window washers apply with equal or greater force to Wyndham's Sales Reps.  Like the window washers, Sales Reps work is seasonal (much like the flow of tourists to Myrtle Beach). *See also Yi v. Sterling Collision Ctrs, Inc.*, 480 F.3d 505, 510 (7th Cir. 2007) (citing irregular work hours

as basis for finding exemption).  As discussed further below, Sales Reps are also highly compensated commissioned salespeople.  "It is hard to see how any of the intended beneficiaries of the Fair Labor Standards Act—a statute primarily designed as we have said to limit competition from marginal workers, that is workers willing to accept substandard wages or to work overtime without demanding a premium—would be helped by the imposition of the overtime provisions of the Act in this setting."  *Mechmet*, 825 F.2d at 1176-77.[13]  As did the *Wells* Court and as required by the Fourth Circuit in *Hodgson* and *Wirtz*, this Court should not zero in on one business—real estate companies—listed among a list of dozens of businesses in a single regulation which itself is part of a large regulatory framework addressing the retail or service exemption, but should instead view the regulations in their entirety.  This is especially true since the regulatory list predates the existence of the U.S. timeshare industry.  The DOL could not have intended to include timeshare companies among those real estate companies lacking a retail concept because timeshare companies did not exist in this country (and certainly not in the form they exist today) when the regulations were enacted in 1971.

Timeshare companies do not appear either on the list of businesses that are typically recognized as retail or the list of those that are not.  The *Davidson* and *Williams* courts wrongly assumed that because timeshare companies sell real estate interests that they are "real estate companies" within the meaning of the regulations and, thus, not retail.  *See Davidson*, 2008 U.S. Dist. LEXIS 6420 at *16-18; *Williams*, 2007 U. S. Dist. LEXIS at *24-25.  However, the regulations do not exclude companies that sell "real estate interests" from the retail or service

---

[13] Further illustrating this point is plaintiffs' testimony that hourly pay was "irrelevant" or "not even an issue" because they were focused on earning commissions.  (Conklin Dep. 54:2-3; Bradley Dep. 55:14-25) or that plaintiffs' purposefully sought to avoid payment of the draw by underreporting their hours.  (Mastandrea Dep. 190:24-191:4, Linick Dep. 108:4-16, 109:18-21, 118:18-22).

exemption. Rather, the regulations specifically recognize that a business that sells real estate interests can be retail. For example, among the list of businesses which possesses a retail concept are cemeteries, which sell real estate interests.  *See* 29 C.F.R. §§ 779.320; *Reich*, 1997 U.S. Dist. LEXIS 23727 at *11 (listing cemeteries as one of those businesses recognized as retail).  There is a specific regulation related to cemeteries, which states, among other things, that "sales of lots or plots" and an "annual tax or assessment levied on lot owners" is included in the gross volume of sales for purposes of applying the retail sales exemption.  29 C.F.R. § 779.370.  In other words, far from taking a business out of the retail exemption, the sale of real estate interests is included when determining if a cemetery business qualifies for the exemption.

Wyndham's business has more of a retail concept and less of a real estate concept than cemetery businesses because its customers are not limited to the use of a single plot of real estate, but rather purchase vacation points that can be used at any number of Wyndham's resorts throughout the country.  (Ex. 3 ¶ 5)  These points are used to obtain stays at numerous Wyndham properties and can be used to obtain hotel rooms, rental cars, amusement park tickets, airline tickets, and can be used to pay for cruises on major cruise lines.  (Ex. 3 ¶ 7)  Wyndham's resorts much more closely resemble hotels, restaurants, and recreational camps, which are included in the regulations as possessing a retail concept, than a traditional "real estate company."  *See* 29 C.F.R. §§ 779.318, 779.320.  Because Wyndham sells its vacation packages to the general public—the end user—to enjoy for personal vacation use, it possesses the necessary retail concept under the regulations.  *See* 29 C.F.R. §§ 779.318, 779.319, In short, by focusing too narrowly on the analogy between real estate companies and the sale of timeshare interests, the courts in *Davidson* and *Williams* misapplied the 7(i) exemption, and those decisions should not be followed by this Court.   Moreover, unlike this case, there was no evidence in *Davidson* or

*Williams* that points could be used to purchase hotel rooms, airline travel, car rentals, amusement park tickets, and to book cruises.  (Ex. 3 ¶ 7)

iii.   <u>At least 75% of Wyndham's sales are not for resale.</u>

The sale of vacation packages are not sales for resale within the meaning of the FLSA regulations.  "A sale is made for resale where the seller knows or has reasonable cause to believe that the goods or services will be resold. . . ."  29 C.F.R. § 779.331.  The regulations further provide that "if at the time the sale is made, the seller has no knowledge or reasonable cause to believe that the goods are purchased for the purpose of resale, the fact that the goods later are actually resold is not controlling."  *Id.*  Courts have interpreted this regulation as requiring that the seller have knowledge that the goods are being purchased for "immediate" resale.  *See Gieg v. DRR, Inc.*, 407 F.3d 1038, 1048 (9th Cir. 2005).[14]  Although some aspects of the vacation packages sold by FL and IH Reps may be resold, most timeshare buyers purchase vacation packages for his own vacation use.  *See Williams v. Trendwest Resorts, Inc.*, 2007 U.S. Dist. LEXIS 62396 (D. Nev. 2007) ("[I]t appears the primary purpose of the vacation credit purchase is to enjoy timeshare vacationing, not to resell the interest.")  Wyndham hopes to make its customers lifetime owners of its vacation products and markets its products accordingly. (Ex. 3 ¶ 8)  At the time of purchase, owners affirm that they are purchasing the points for recreational use and not for financial profit (Ex. 2 ¶ 8; DEF 008116).  Moreover, the vacation packages sold by Disco Reps cannot be resold.

In any event, Wyndham has no expectation that its vacation packages will be *immediately*

---

[14] The section of the regulations under the subheading "Sales not made for resale" addresses issues related to goods sold as raw materials and goods sold as parts or ingredients in other goods.  *See* 29 C.F.R. §§ 779.332, 779.333.  The idea behind this requirement is clearly to ensure that the exemption applies only to those businesses which sell to the end user.  As noted, Wyndham sells vacation packages to consumers—the end users of its vacation products.

resold.  The case of *La Parne v. Monex Deposit Co.*, 714 F. Supp. 2d 1035 (C.D. Cal. 2010), illustrates this point clearly.  In that case, the plaintiffs argued their employer, Monex, which sells precious metals for investment purposes, was not a retail or service establishment because the goods that it sold were designed to be resold.  *Id.* at 1040.  The court rejected this argument and applied the 7(i) exemption, noting that Monex has no knowledge of if or when its products would be resold, and, thus, "Monex's sales are sales of goods not for resale."  *Id.* at 1040-41.  Accordingly, this factor also supports a finding that Plaintiffs are exempt.[15]

### b. More Than Half of Each Sales Rep's Compensation Represents Commissions.

The second requirement for the 7(i) exemption to apply—that at least half of the plaintiff's income derive from commissions—is satisfied here. As discussed above, Sales Reps are paid a draw that is recoverable against commissions earned.  Commissions for Sales Reps are based on a percentage of sales.  (JW, ¶ 4.)  Thus, the commissions paid to Sales Reps qualify as commissions within the meaning of 7(i). *See Yi v. Sterling Collision Ctrs., Inc.*, 480 F.3d 505, 508 (7th Cir. 2007) (explaining that the "essence of a commission is that it bases compensation on sales"). The draw is paid weekly and is an advance against Sales Rep's future commissions which is recoverable by Wyndham when the Sales Rep earns enough in commissions to cover the amount advanced.  (JW, ¶ 4.)  Thus, as long as a Sales Rep has no draw balance, then, in effect, 100% of the compensation paid to the Sales Rep is in the form of commissions. This method paying commissions is specifically sanctioned by the regulations as one of the ways that retail or service establishment employees are generally compensated.  *See* 29 C.F.R. §

---

[15] Alternatively, even if the Court concludes that Sales Reps do not qualify for the 7(i) exemption because they sell real estate interests, Disco Reps still qualify for the 7(i) exemption because the product sold by Disco Reps is a trial vacation package and not a real estate interest.  (Crawford Dep. 11:1-19; Velasco Dep. 24:2-4;  Linick 44:20-51:9.)   Neither *Davidson* nor *Williams* addressed the applicability of 7(i) to Discovery representatives.  Plaintiffs Crawford, Linick, and Velasco have worked as Disco Reps.

779.413(a)(5). Here, the evidence shows that all 18 Plaintiffs had either no draw balance or minimal draw balances at the time their employment with Wyndham ended. (*See* Exhibit 5, Declaration of Scott Pechaitis ¶7, Exs. A-B.) Thus, the requirement that more than half of the Disco Rep's income derive from commissions is easily satisfied. (*Id.*).

### c. Sales Reps Earned More Than One and A Half Times The Federal Minimum Wage During Many Weeks of Their Employment.

The final requirement for the 7(i) exemption is that the regular rate of each Sales Rep must be 1.5 times the minimum wage for the exemption to apply in any particular workweek. 29 U.S.C. § 207(i).  For purposes of 7(i), the regular rate is defined as "'the hourly rate actually paid the employee for the normal, nonovertime workweek for which he is employed' and 'by its very nature must reflect all payments which the parties have agreed shall be received regularly during the workweek, exclusive of overtime payments.'"   29 C.F.R. § 779.419 (*quoting Walling v. Youngerman-Reynolds Hardwood Co.*, 325 U.S. 419 (1945)).  An employee may qualify for the exemption in some weeks and not others.  *See id.* ("If it is not more than one and one-half times such minimum rate, there is no overtime pay exemption for the employee *in that particular workweek*.") (emphasis added); *Johnson v. Wave Comm GR LLC*, 4 F. Supp. 3d 423, 445-46 (N.D.N.Y. 2014) (recognizing that exemption can be applied to those weeks in which the one and one-half times minimum wage requirement is satisfied and not applied to those weeks in which it is not); *Owopetu v. Nationwide CATV Auditing Servs., Inc.*, 2011 U.S. Dist. LEXIS 24948, at *32-33 (D. Vt. Mar. 11, 2011) (same); *Viciedo v. New Horizons Computer Learning Center of Columbus*, 246 F. Supp. 2d 886, 895 (S.D. Ohio Feb. 25, 2003) (same).  The regular rate is calculated by dividing straight-time earnings by hours worked. *Id.* Here, at all relevant times, the federal minimum was $7.25 an hour and the exemption will be satisfied for all weeks in which a Plaintiff's regular pay exceeds $10.88 per hour.

Applying the above principles to this case is straight-forward. (Ex. 5 ¶¶ 5-13, Exs. A-B.) Though their testimony varies widely, Plaintiffs testified generally that during most weeks of their employment they worked between 45-70 hours each week. For purposes of this summary judgment motion only, Wyndham will assume that the testimony of Plaintiffs is true and will further assume that Plaintiffs worked 70 hours each week every week (which is far more hours than most Plaintiffs testified to working during most weeks of their employment). Even with these assumptions, Plaintiffs as a group are exempt under 7(i) between 35% and 36% of the weeks they worked, depending upon whether a 2 or 3 year statute of limitations applies. Individual reps' exemptions range between 17% for Mastandrea and 100% for Suitt (Ex. 5, Exs. A-B) of the weeks based upon the same limitations. Thus, it is apparent that for a substantial number of weeks, Plaintiffs are exempt from the overtime requirements under federal law and the Court should grant Wyndham's Motion for such weeks and dismiss their claims.

### H. Defendants Are Entitled To Summary Judgment During Specific Weeks For Which Plaintiffs Have Admitted They Cannot Assert Minimum Wage Or Overtime Claims.

#### 1. Defendants are entitled to summary judgment on Plaintiffs' overtime claims during weeks for which Plaintiffs' admitted that their payroll records were accurate, that they worked no overtime, or that they were not entitled to overtime compensation for such weeks.

Exhibit 6 summarizes the deposition testimony of Plaintiffs who have admitted, at least for certain weeks of their employment, that they are not entitled to overtime compensation. For example, as detailed in the deposition testimony set forth in Ex. 6, some Plaintiffs admitted during their deposition that the records maintained by Wyndham for certain weeks are accurate; some Plaintiffs conceded during their deposition that during some specific weeks of employment, they did not work more than 40 hours; some Plaintiffs testified that they experienced leaves of absence during certain weeks and therefore did not work overtime during

such weeks; and some Plaintiffs testified that they worked as managers during periods of their employment and that they are not seeking overtime payments for such workweeks.  (Ex. 6)

Because Plaintiffs clearly did not work any overtime hours during the weeks identified on Exhibit 6, and have admitted that they are not seeking overtime for such weeks, Defendants are entitled to summary judgment with regard to these specific weeks.  *Caminiti v. County of Essex*, 2007 U.S. Dist. LEXIS 56361, at *8 (D.N.J. 2007) (dismissing overtime claim for ten weeks during which plaintiff admitted to working less than 40 hours); *Garcia v. EHealth Screenings, L.L.C.*, 2014 U.S. Dist. LEXIS 15465, at *8 (W.D. Tex. 2014) (dismissing overtime claims based on admissions by plaintiff during deposition); *Boshaw v. Spartan Stores, Inc.*, 2005 U.S. Dist. LEXIS 32265, at *13 (W.D. Mich. 2005) (same).

> **2.    Defendants Are Entitled to Summary Judgment with Regard to Weeks During Which Plaintiffs Admit They Were Paid At Least The Required Minimum Wage.**

Exhibit 7 summarizes the deposition testimony of Plaintiffs who admitted that they were paid the applicable minimum wage during certain weeks of their employment.  Given these admissions, Defendants are entitled to summary judgment on Plaintiffs' overtime claim with regard to these specific weeks.  *Caminiti*, 2007 U.S. Dist. LEXIS 56361 at *8; *Boshaw*, 2005 U.S. Dist. LEXIS 32265 at *13.

> **3.    Defendants Are Entitled to Summary Judgment As to The Claims of Plaintiffs Who Testify That They Do Not Know How Many Hours They Worked During Certain Weeks of Their Employment.**

Exhibit 8 summarizes the deposition testimony of Plaintiffs who testified, after reviewing the time records maintained by Wyndham, that they did not know how many hours they worked and had no records or other evidence to support any claims for hours worked other than Wyndham's time records.  For example, April McLean testified repeatedly that she did not know

or did not recall how many hours she worked specific workweeks.  (Ex. 8)  Similarly Gary Conklin testified that he did not recall and did not know how many hours he worked during specific workweeks at his employment.  (Ex. 8)  Richard Reynolds testified that "there is really no way to tell" how many hours he worked during specific weeks of his employment and that he did not even have an estimate as to the number of hours he worked. (Reynolds Dep. 142:5-20; 143:8-10, 144:4-6.)

Defendants are entitled to summary judgment with regard to weeks in which Plaintiffs were unable to testify as to any amount of overtime hours worked. "An  employee  who  brings suit . . . for unpaid minimum wages or unpaid overtime compensation . . . has the burden of proving that he performed work for which he was not properly compensated." *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 686-87 (1946) (superseded by statute as stated in *IBP, Inc. v. Alvarez*, 546 U.S. 21, 25-26 (2005)).  To prevail on an FLSA overtime claim, an employee must prove by a preponderance of the evidence that he worked overtime hours without compensation and that the employer knew of such work. *Lyle v. Food Lion, Inc.*, 954 F.2d 984, 987 (4th Cir. 1992).  To prove "that he has in fact performed work for which he was improperly compensated" the plaintiff must "produce[] sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." *Mt. Clemens Pottery*, 328 U.S. at 687.

To succeed on an FLSA claim for unpaid overtime, Plaintiffs therefore have the burden of proving that they performed work for which they were not properly compensated.  *Lyle*, 954 F.2d at 987.  It is Plaintiffs' burden to "produce[] sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." *Anderson*, 328 U.S. at 687.  At the summary judgment stage, Plaintiffs must set forth specific facts showing there is a genuine issue for trial.  *See* Fed R. Civ. P. 56(c).  Here, the only evidence Plaintiffs have to support any

claim for overtime is their own self-serving, contradictory, and conclusory testimony.    In contrast, Defendants have produced detailed and accurate timekeeping records from their timekeeping system, showing every time Plaintiffs clocked in and clocked out every day that they worked. The system records every instance in which these records are manually altered or overridden.  Plaintiffs' conclusory testimonial evidence fails in the face of Defendants' detailed time records.[16]

Other district courts within the Fourth Circuit have granted summary judgment for employers under very similar circumstances.   For example, in *McLaughlin v. Murphy*, the plaintiff, a loan officer who was paid on commission, alleged that at various times during his employment he worked more than 40 hours per week without receiving overtime in violation of the FLSA.  *McLaughlin v. Murphy*, 436 F. Supp. 2d 732, 735 (D. Md. 2005), *aff'd*, *McLaughlin v. Murphy*, 2007 U.S. App. LEXIS 15560 (4th Cir. 2007).   Similar to Plaintiffs in this case, during his deposition McLaughlin testified that he did not know how many hours he had worked.  *Id.* at 738.  In his interrogatory responses, however, McLaughlin stated that he worked between

---

[16] Although the Second Amended Complaint makes allegations that Defendants have failed to maintain records, it is long established that no private right or action exists for alleged recordkeeping violations under the FLSA.  *See, e.g.*, *Castillo v. Givens*, 704 F.2d 181, 198 n. 41 (5th Cir. 1983) (overruled on other grounds by *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128 (1988)); *Elwell v. Univ. Hosps. Home Care Servs.*, 276 F.3d 832, 843 (6th Cir. 2008).  Only the Department of Labor may bring an action to enforce the recordkeeping requirements of the FLSA.  Moreover, simply alleging that records are not, in the view of a litigant, accurate does not establish a recordkeeping violation.  *See, e.g., Schremp v. Langlade County*, Case No. 11-590, 2012 U.S. Dist. LEXIS 106344 at *6-8 (E.D. Wis. July 31, 2012) (collecting cases where summary judgment was awarded to employer in situations like this where the burden was on employee to properly record his or her time and employee failed to do so); *Joza v. WW JFK, LLC*, No. 07-4153-ENV, 2010 U.S. Dist. LEXIS 94419 at *27-30 (E.D.N.Y. Sept. 10, 2010) (same).  Here, the evidence is undisputed that Wyndham maintained detailed time and payroll records that recorded the time worked each day and any element of compensation.   It is also undisputed that Plaintiffs were disciplined and even terminated for failing to follow these policies.   [insert cites]
.

40 and 55 hours a week.  The district court concluded that McLaughlin's speculation as to the number of hours he worked failed to "meet his burden of showing as a matter of 'just and reasonable inference,' either the uncompensated hours he worked, or the number of uncompensated hours [his employer] 'suffered' or 'permitted' him to work."  *Id.*  The district court made this finding even though McLaughlin's employer did not maintain records of the number of hours he worked.  *Id.* at 737.

Courts in other jurisdictions have also granted summary judgment for the employer where the employee's claim for overtime is supported by nothing more than his own self-serving statements.  In *Turner v. The Saloon Ltd.*, the plaintiff argued that one of his supervisors directed him to alter his time records so as to make him ineligible for overtime.  595 F.3d 679, 690 (7th Cir. 2010).  In response to this argument, the employer produced its time records to refute the plaintiff's claim.  The Seventh Circuit affirmed the trial court's grant of summary judgment to the employer, reasoning as follows:

> [The plaintiff] has the burden of proving that he performed overtime work for which he was not properly compensated, and if he contends that his employer's records are not accurate—which he does—then he must "produce[] sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference."  Although [the plaintiff] disputes the accuracy of The Saloon's records, his mere assertions are insufficient to create a jury issue.

*Id.* at 691 (internal citation omitted).  The Court further describes Turner's claim as "flimsy in the extreme."  *Id.*  Similarly, in *Vince v. Illinois Central School Bus, LLC*, the plaintiff, like the Plaintiffs in this case, claimed to work a significant amount of overtime each week, and like these Plaintiffs, her "deposition testimony and her affidavit comprise the entirety of the evidence to support her wage claims." *Vince v. Ill. Cent. Sch. Bus, LLC*, Case No. 09-5360, 2011 U.S. Dist. LEXIS 12858 at *33 (N.D. Ill. Feb. 9, 2011).  The district court rejected the plaintiff's

claim, noting that "throwing darts at a calendar would seemingly provide as reliable a time period for this work as would discerning the dates from Plaintiff's evidence." *Id.* at \*37.  As in this case, "Defendants have produced payroll records from many of the months that Plaintiff allegedly worked her extensive overtime hours that show that during some of these weeks, Plaintiff was paid for working less than 40 hours." *Id.*  Of particular relevance to the Court's decision in this case, the district court in *Vince* concluded,

> While the Court does consider Plaintiff's affidavit and deposition testimony in determining if a genuine issue of material fact exists for trial, it does not find that these statements, unsupported by any documentary evidence or corroborating testimony, create the just and reasonable inference required by *Anderson*. Therefore, the Court grants Defendants' Motion for Summary Judgment on Counts IV, V, and VI.

*Id.* at \*37-38.  *See also Schremp*, 2012 U.S. Dist. LEXIS 106344 at \*10 ("A mere averment of hours worked does not constitute definite and certain evidence of hours worked); *Carson v. J Curt Inc.*, Case No. 1:06-98, 2007 U.S. Dist. LEXIS 11903 (N.D. Fl. Feb. 21, 2007) (granting defendant's motion for summary judgment on overtime claim where plaintiff's offered no evidence to support his claim other than his own testimony). Plaintiffs' testimony that they did not know or cannot recall how many hours they worked cannot meet their burden of establishing compensated overtime.  Again, Plaintiffs' conclusory statements that they worked overtime are insufficient to overcome Defendants' summary judgment motion.  Thus, because Plaintiffs have failed to carry their burden, the Court should grant Defendants' Motion with respect to the overtime claims referred to in Exhibits 8.

## III.    CONCLUSION

For the reasons set forth above, Defendants' Motion For Summary Judgment should be granted.

Respectfully submitted this 3rd day of September, 2015.

s/*D. Christopher Lauderdale*
D. Christopher Lauderdale (Fed. Bar No. 9051)
T. Chase Samples (Fed. Bar No. 10824)
JACKSON LEWIS P.C.
15 South Main Street, Suite 700
Greenville, South Carolina 29601
Telephone: 864-232-7000
Facsimile: 864-235-1381
Email: lauderc@jacksonlewis.com
         chase.samples@jacksonlewis.com

ATTORNEYS FOR DEFENDANTS
WYNDHAM VACATION RESORTS, INC. and
WYNDHAM OWNERSHIP, INC.