**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**FLORENCE DIVISION**

| | |
|---|---|
| **RICHARD REYNOLDS, SHARON LINICK, LINDA NEELY, JOSEPH SCHUBERT, and DOREEN MASTANDREA, JONATHAN ANDERSON, STEVEN BRADLEY, GERRY CONKLIN, JENNIFER CRAWFORD, DANIEL DELPRIORA, JOHN MAYNARD, APRIL MCLEAN, MIKE SMITH, WILLIAM SUITT, DONNA WEINBERG, LARRY MARSHALL, MICHELLE JOHNSON, and EDMUNDO VELASCO, Individually and on behalf of other employees similarly situated,** | **C.A. NO. 4:14-cv-2261-PMD** |
| **Plaintiffs,** | |
| **v.** | |
| **WYNDHAM VACATION RESORTS, INC., and WYNDHAM VACATION OWNERSHIP, INC.** | |
| **Defendant.** | |

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS'**
**MOTION FOR SUMMARY JUDGMENT**

Plaintiffs file this Response in opposition to Wyndham's Motion for Summary Judgment and in support thereof will respectfully show the following:

**I.**
**THE COURT HAS DISCRETION TO MANAGE THE**
**COLLECTIVE ACTION PROCEDURE**

Wyndham asserts that the fifteen named Plaintiffs for whom consent forms have not been filed should be dismissed from the case. This is a misstatement of both the facts and the law.

1

The fifteen Plaintiffs in questions became parties to this lawsuit when they were added as named plaintiffs. All the Plaintiffs in question joined this lawsuit as named parties in a timely manner and are pursuing their claims for unpaid wages in their individual capacity and on behalf of similarly situated individuals. Dkt. No. 1, 37 and 61, ¶3. Therefore, they are already parties to the lawsuit regardless of whether their consent forms have been filed.

Even though the fifteen plaintiffs are already parties to this lawsuit in their individual capacity, this court has the power to accept their consent form at any time. The FLSA provides for an opt-in procedure but it does not prescribe a time period within which proof of consent must be filed. *Ruggles v. Wellpoint, Inc.*, 687 F. Supp. 2d 30, 37 (N.D.N.Y. 2009); *Robinson-Smith v. Gov't Employees Ins. Co.*, 424 F. Supp. 2d 117, 123 (D.D.C. 2006); *See also* 29 U.S.C. §§ 216(b), 255, 256. Rather, it grants the district court "the requisite procedural authority […] and] managerial responsibility to oversee the joinder of additional parties to assure that the task is accomplished in an efficient and proper way." *Hoffman–La Roche, Inc. v. Sperling*, 493 U.S. 165, 170–71 (1989). "The FLSA does not specify when a person must opt-in to a collective action, rather, the deadline is set by the court." *Ruggles*, 687 F. Supp. 2d at 37. Accordingly, this procedural authority imbues the district court with broad discretion to adopt, manage, and modify procedures necessary to effectuate the FLSA's collective action. *Hoffman–La Roche*, 493 U.S. at 169; *see also, Billingsley v. Citi Trends, Inc.*, No. 13-12561, 2014 WL 1199501 at *6-7 (11th Cir. Mar. 25, 2014)[1]; *Alvarez v. City of Chicago*, 605 F.3d 445, 449 (7th Cir. 2010);

---

[1] The breadth of the Court's authority is illustrated by the Eleventh Circuit's recent decision affirming the use of that authority to protect the class:

> Given the "broad authority" that the district court has to manage parties and counsel in an FLSA collective action, the district court did not abuse its discretion in determining that [employer's] conduct in the summer of 2012 undermined the court's authority to manage the collective action. Nor did the district abuse its discretion in determining that—to correct the effect of [employer's] misconduct—it would allow putative collective action members to join

*Nehmelman v. Penn Nat. Gaming, Inc*., 822 F. Supp. 2d 745, 750 (N.D. Ill. 2011); *Pelczynski v. Orange Lake Country Club, Inc*., 284 F.R.D. 364, 367 (D.S.C. 2012). This includes the discretion to accept consents submitted after an opt-in deadline passes. *See e.g., Thompson v. Linda And A., Inc*., 779 F. Supp. 2d 139, 145 (D.D.C. 2011) (accepting untimely opt-ins); *Robinson-Smith*, 424 F. Supp. 2d at 123 (D.D.C. 2006) (same).

Accordingly, a number of courts have permitted late opt-ins to join collective actions. *See e.g., Ruggles v. Wellpoint, Inc*., 687 F.Supp.2d 30 (N.D.N.Y.2009) (one month); *Heaps v. Safelite Solutions, LLC*, No. 2:10–cv–729, 2011 WL 6749053 (S.D. Ohio Dec. 22, 2011); *Ayers v. SGS Control Servs., Inc*., Nos. 03-Civ.-9078(RMB), 06-Civ.-7111(RMB), 2007 WL 3171342 (S.D.N.Y. Oct. 9, 2007); *Monroe v. United Air Lines, Inc*., 94 F.R.D. 304 (N.D. Ill. 1982). For example, in *Ayers v. SGS Control Services* the district court applied this reasoning to deem untimely consent forms timely provided if they were mailed to plaintiffs' counsel within the proscribed opt-in period. *See Ayers*, 2007 WL at *5 (and construing any ambiguity in favor of allowing participation). This would be the case here if the fifteen plaintiffs in question had they not already been added as named plaintiffs through amended complaints.

These courts' flexible approach to the collective action procedure is not merely an exercise of discretion, but reflects the pragmatic conclusion that dismissing individuals seeking to join a collective action undermines notions of judicial economy and Congress' preference that these claims be adjudicated collectively. *See Hoffmann-La Roche*, 493 U.S. at 170; *see also Mitchell v. Lublin, McGaughy & Assocs.*, 358 U.S. 207, 211 (1959) (as a remedial statute, the FLSA "has been construed liberally to apply to the furthest reaches consistent with congressional

---

the lawsuit notwithstanding their coerced signing of the arbitration agreements. *Billingsley*, 2014 WL at *7-8.

direction."); *see also Billingsley*, 2014 WL at *5-6 (discussing the intent effect of the Act). As a

practical matter, granting Wyndham's motion and dismissing the fifteen individuals who are

already named Plaintiffs in this action, would create the potential for judicial chaos since these

individuals would be free to re-file this identical lawsuit proceeding individually in district courts

all across the nation.[2] As the court explained in *Heaps*,

> In terms of judicial economy, were the Court to deny the admission of these plaintiffs,
> they would still be able to file separate claims for relief against Defendant, who would
> still face the prospect of defending against their individual FLSA claims. *See Ruggles*,
> 687 F.Supp.2d at 37 (citing 29 U.S.C. § 256(b)). Indeed, Plaintiffs suggest that they
> would file separate actions and then request consolidation with the instant action.
> "Obviously, there is little economy in spawning identical FLSA lawsuits that themselves
> might be properly joined with this lawsuit in the future."

*Heaps*, 2011 WL at *2 (docket citations omitted); *see also Monroe*, 94 F.R.D. at 305 (N.D. Ill.

1982) ("the alternative may be to force the filing of individual lawsuits-scarcely productive of

economy either for the litigants or for the courts.").

In this case, the Plaintiffs' Motion for Conditional Collective Certification is still

pending. The modest relief Plaintiffs request here comports with the remedial intent of the Act

and courts adopting "[a] generous reading, in favor of those whom congress intended to benefit

from the law, is also appropriate when considering issues of time limits and deadlines." *Kelley v.*

*Alamo*, 964 F.2d 747, 750 (8th Cir.1992) (citing An*derson v. Montgomery Ward & Co.*, 631 F.

Supp. 1546, 1550 (N.D. Ill.1986), aff'd, 852 F.2d 1008 (7th Cir. 1988)); see also Ruggles, 687

F.Supp.2d at 38 (same); *In re Wells Fargo Home Mortg. Overtime Pay Litigation*, 2008 WL

4712769 at *2 (same for 350 late consents); *Schaefer–LaRose v. Eli Lilly & Co.*, No. 1:07–cv–

1133–SEB–TAB, 2008 WL 5384340, at *2 (S.D. Ind. Dec. 17, 2008) (same). As one court

---

[2] It strikes Plaintiffs that this outcome would be significantly more prejudicial to the company on account of the cost
to defend hundreds of disparate, individual actions.

4

explained in support of its decision to accept untimely consents, "we should not become slaves of that deadline beyond its reason for existence." *Monroe*, 94 F.R.D. 304, 305 (N.D. Ill. 1982).

Wyndham fails to fully consider the factors this Court should weigh, including judicial economy and prejudice to the defendant. *See In Re Wells Fargo Home Mortgage Overtime Pay Litigation*, No. MDL 06–01770 MHP, 2008 WL 4712769 at 2 (N.D.Cal. Oct.23, 2008) (citing *Raper v. State of Iowa*, 165 F.R.D. 89, 92 (S.D. Iowa 1996)). Considerations as to judicial economy weigh heavily in favor of Plaintiffs' position here. And while the issue of prejudice is considered more fully below, suffice it to say here that there is none. Defendants' motion should be denied and Plaintiffs respectfully request that their forthcoming motion for equitable tolling be granted.

## I.
## WYNDHAM WAIVED ITS DEFENSES AGAINST RICHARD REYNOLDS

Defendants waived the following defenses by not pleading them in their Answers to the Complaints filed in this lawsuit:

> "Reynolds Lacks Standing to Pursue his Claims Against Defendants and
> This Court, Therefore, Lacks Subject-Matter Jurisdiction Over His Claims.
> Alternatively, Reynolds Is Judicially Estopped From Pursuing These Claims."

Def. Br. at 15. *See* Defendants' Answers at Dkt. No. 40, 64. In response to the averments in paragraph 4 of Plaintiffs' complaints, Defendants pleaded, "Defendants admit only that this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331."   Defendant has never raised the issue of Mr. Reynolds's bankruptcy filing in any of it's prior pleadings or discovery responses. Wyndham's Summary Judgment Exhibit 2 should be stricken because it was not previously produced in discovery or provided as part of Wyndham's disclosures.

Second, Wyndham's use of the estoppel theory is subject to the whim of the Court. Estoppel is an equitable remedy, and as such, the Court has discretion on whether to employ it. *See King v. Herbert J. Thomas Mem'l Hosp.*, 159 F.3d 192, 196, 198 (4th Cir. 1998) ("As an equitable doctrine, judicial estoppel is invoked in the discretion of the district court"). *Hovis v. General Dynamics Corporation*, 396 B.R. 895, 2007 U.S. Dist. LEXIS 47151 (D.S.C. 2007). Where a debtor has failed to disclose a claim through inadvertence or mistake, the court may choose not to apply the doctrine of judicial estoppel against him.

For judicial estoppel to apply, the following four elements must be present: (1) the party to be estopped must be advancing an assertion that is inconsistent with a position taken during previous litigation; (2) the position must be one of fact, rather than law or legal theory; (3) the prior position must have been accepted by the court in the first proceeding; and (4) the party to be estopped must have acted intentionally, not inadvertently. *Havird Oil Co. v. Marathon Oil Co.*, 149 F.3d 283, 292 (4th Cir. 1998) (citing *Lowery v. Stovall*, 92 F.3d 219, 224 (4th Cir. 1996)). Pursuant to this doctrine, some courts have found that a debtor's failure to list the claim in his schedules or disclosure statements bars the claim. However, it is ultimately up to the Court to determine whether estoppel should applied in cases where a debtor has failed to disclose a pending claim. Since Wyndham wavied the judicial estoppel defense when it failed to raised it in it's answer or described in any of it's discovery responses, the Court should decline summary judgement based on this request.

Lastly, Mr. Reynolds's alleged lack of standing is easily cured. Should the Court find that Mr. Reynolds lacks standing, his bankruptcy estate Trustee should be allowed to join this case in his stead. The Fourth Circuit has held, a debtor's pre-petition causes of action are the property of the bankruptcy estate. *In re Richman*, 104 F.3d 654, 657 (4th Cir. 1997) ("A trustee is the

representative of the bankrupt's estate and has the capacity to sue or be sued.") *See also Gardner v. Tyson*, 218 B.R. 338, 342 (Bankr. E.D. Pa. 1998). ("[T]he Trustee's status as representative of the estate requires that he be the party suing to assert any pre-petition causes of action asserted by Chapter 13 debtors."); *Richardson v. United Parcel Service*, 195 B.R. 737, 739 (E.D. Mo. 1996) ("[T]he bankruptcy trustee steps into the shoes of the debtor for purposes of asserting or maintaining the debtor for purposes of asserting or maintaining the debtor's causes of action."). Instead of dismissing Reynolds' claims, he should be allowed to petition for relief through his bankruptcy trustee.

## III.

### A GENUINE ISSUE OF MATERIAL FACT EXISTS AS TO WILLFULNESS

Wyndham argues that "In summary, the Plaintiffs, who admitted to willfully violating Wyndham's policies cannot establish a willful violation by Wyndham." Def. Br. at 24. This is not the law. There is no legal basis for Wyndham's argument.

Claims under the Fair Labor Standards Act for unpaid minimum wages, unpaid overtime compensation, or liquidated damages are subject to a statute of limitations which requires parties to commence their case within two years of the accrual of the action. 29 U.S.C. § 255(a). However, if the cause of action arises out of a willful violation of the FLSA, a plaintiff is given three years to commence an action. *Id.* An action is considered "commenced" under the FLSA "on the date when the complaint is filed, if he is specifically named as a party plaintiff in the complaint and his written consent to become a party plaintiff is filed on such date in the court in which the action is brought" or "if such written consent was not so filed or if his name did not so appear on the subsequent date on which such written consent is filed in the court in which the action was commenced." 29 U.S.C. §§ 256(a), 256(b). As a result, a plaintiff that opts into a

7

collective FLSA suit is limited to looking back two or three years for violations of the FLSA by their employer.  A violation of the FLSA is considered "willful" if an employer either knew it was violating the FLSA or "showed reckless disregard" toward it. *McLaughlin v. Richland Shoe Co.* , 486 U.S. 128, 133, 108 S. Ct. 1677, 100 L. Ed. 2d 11 5 (1988). Mere negligence on the part of the employer with regard to compliance with the FLSA is not sufficient to prove willfulness. *Id*. The burden of showing that an FLSA violation was "willful" falls on the plaintiff.  *See Perez v. Mountaire Farms, Inc.*, 650 F.3d 350, 375 (4th Cir. 2011).

### 1. Wyndham Willfully Hid Overtime Hours Worked by Plaintiff

Despite movant's elaborate description of its time keeping policies, in practice the time these policies were mere window dressing in contrast with Wyndham's practice of reducing the amount of overtime hours by requiring Plaintiffs to clock out and work off-the-clock.  An employer's violation is willful only if it "knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute . . . ."  *McLaughlin v. Richland Shoe Co*. , 486 U.S. 128, 133 (1988).  Willfulness has been found when the evidence demonstrated that an employer actually knew its pay structure violated the FLSA or ignored complaints that were brought to its attention.  *See Ikossi-Anastasiou v. Bd. of Supervisors of La. State Univ*. , 579 F.3d 546, 553 n.24 (5th Cir. 2009).

There are numerous examples of Plaintiffs complaining about overtime violations and Wyndham supervisors purposely suppressing records of overtime hours and requiring employees to work off-the-clock. Jennifer Crawford complained to her managers Kayla Ferris and Jeff Wicker that her paycheck wasn't correct. "I told [Kayla] it was illegal what she was doing...she said, 'You didn't punch out' and I said, 'Kayla, I always punch out,' and she said, 'No, you didn't and I fixed it and sent it to Joy,' Joy, which was payroll. I said, 'How can you do that

without your signature on it?' She said, 'Don't worry about it. I've sent it to Joy.' And I said, 'Kayla, that's illegal, what you're doing.'" Exh. E, Crawford Dep. Trans. p. 142. Ms. Crawford also stated that a similar incident happened with Jeff Wicker, which led her to start taking pictures of the time clock. "[I]t would say one thing one day and something else another day, and I was missing a whole--a whole day on it. And I told Jeff that, and he said, 'Well, that's just the way it is, Jennifer.'" *Id*., p. 143.

Doreen Mastandrea complained to Human Resources about Vince Coletta telling her to clock out and keep working. Exh. F, Mastandrea Dep. Trans. p. 99. William Suitt complained that his paychecks did not accurately reflect the pay he thought he was owed. "I felt my checks were different and I would--you'd get kicks or whatever that goes back, or I didn't get paid the commission I thought I'd get paid on, and just went back and forth. And their eyes was just like, well, pick up the pieces and go better." Exh. G, Suitt Dep. Trans. p. 105-106)

Gary Conklin stated that he was explicitly told to talk to potential buyers off the clock, and only clock back in if the interaction went to the contracts stage. "My director, Mylinh Crane, has told me to clock out and go on that table, and if it goes in contracts, clock back in because they have to match up; your timecard and contracts have to match." Exh. H, Conklin Dep. Trans. p. 53. Sometimes Wyndham managers would simply adjust a sales representative's time without giving him or her an opportunity to review the adjustments being made—contrary to Wyndham's own timekeeping policy. "[T]here was [sic] many times that [my managers] said I didn't punch out and they redid the time, and I did not sign anything…Probably at least two dozen, three dozen times." Exh. E, Crawford Dep. Trans. p.10.

Wyndham claims that Plaintiffs allege "a handful of lower-level supervisors" instructed them to work off the clock and altered time records. To the contrary, Plaintiffs name at least 10

9

different managers, out of 31 total managers that were disclosed by Wyndham, who engaged in misconduct. Linda Neely stated that her supervisor, Greg Perpetua, instructed her to clock out and just keep working. Exh. I, Neely Dep. Trans. p. 138. Doreen Mastandrea named Vince Coletta and Tom Young as managers who told her to work off the clock. Exh. F, Mastandrea Dep. Tran. p. 84-85.

Contrary to Wyndham's position, Plaintiffs were following the record keeping policies that were practiced on a day to day basis at the actual sales locations. Some of this misconduct took place in manager meetings where time shaving was openly discussed. William Suitt testified that John Waller, Eric Burdess, Dusty Cook, Joey Dillon, and Ray Lopez were present during sales manager meetings where time shaving was discussed. Exh. G, Suitt Dep. Tran. 137-38, 145-47). Manager John Waller told Mr. Suitt, "[I]f you're on tour, you punch in. If you're not, you punch out." *Id*., p. 29. On days when he was getting close to 40 hours another manager, Jimmy Jones, said "Don't clock in unless you get a sale." *Id*. p. 63. Brook Conklin (a non-party to this lawsuit), William Suitt, and Gary Conklin were all managers for Wyndham at one point and testified that they were told to engage in the same behavior by their peers and supervisors. Ms. Conklin was instructed to "look the other way when our representatives worked off the clock" because managers whose sales representatives worked overtime got written up or fired. Brook Conklin Dec., ¶7.

Wyndham states, "Plaintiffs testified that they willfully disregarded Wyndham's timekeeping policy because they were interested in making sales and earning commissions, not minimum wage in the form of a draw." Def Br. at 22. Yet Wyndham completely ignores these same Plaintiffs' testimony that they followed the off-the-clock timekeeping policies (which contradicts Wyndham's written policies) under the express direction of their supervisors. Exh. H,

10

Conklin Dep. p. 53; Def. Exh. 1, Bradley Dep. p. 182; Exh. J, Linick Dep. p. 107-108; Exh. F, Mastandrea Dep. p. 84-85). The argument that some of the Plaintiffs are not credible because they have been disciplined for violating Wyndham's timekeeping policies. Def. Br. at 21-22. However, the Fourth Circuit has held that the determination of willfulness depends in part upon witness credibility. *Lyle v. Food Lion, Inc*., 954 F.2d 984, 987-88 (4th Cir.1992). But credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge ruling on a motion for summary judgment. *Meyers v. Baltimore County*, 713 F.3d 723, 730 (4th Cir. Feb. 1, 2013) (credibility determinations are not part of summary judgment proceedings).

The plaintiffs have put forth evidence that Wyndham knew that it was violating the FLSA or recklessly disregarded a potential violation. Accordingly, genuine issues of material fact exist on whether Wyndham willfully violate the FLSA and the three-year statute of limitations cannot be resolved at this point.

## 2. There is a Pending Motion to Compel to Show Wyndham's Time Record Conflicts with Its Own Timestamped Work Records

Summary judgement is not appropriate at this point in the case because Wyndham has failed to provide complete records of time stamped transactional records that demonstrate Plaintiffs were working after they had clocked out for the day. In the event the court rules favorably on Plaintiff's motion to compel (Dkt. No. 62), additional summary judgement evidence will be available to demonstrate that Wyndham was actively hiding overtime hours and was fully aware that Plaintiffs were working off-the-clock and generating sales transaction after hours on a regular basis.

One central issue in this case is determining the work activities and hours worked by

Plaintiffs. Another central issue is whether Plaintiffs and members of the putative FLSA collective class were subject to the same company-wide policy of performing off-the-clock work. Plaintiffs maintain that the time clock records kept by Defendant do not accurately reflect all the hours they worked. When an employer's time records are inaccurate or inadequate, employees may prove their claims by producing "sufficient evidence" to show they performed work for which they were not compensated. *Anderson v. Mt. Clements Pottery Co.*, 328 U.S. 680, 687 (1946).

In pursuit of such evidence, Plaintiffs have sought their complete records of the sales contracts executed in the course of their employment with Defendant because they will likely show work activities and hours worked, including their off-the-clock work. Plaintiffs have also sought the identity and contact information of current and former contracts department employees and sales representatives employed by Defendant during the relevant statutory period. Plaintiffs believe these individuals will have relevant and probative information pertaining to a) Plaintiffs' after hours work; b) Defendant's implementation and enforcement of a company-wide policy of performing off-the clock work; c) Defendant's time stamped daily transactional records that shows Plaintiff's work activities outside of their clock-out time records; and d) Defendant's policy of time shaving.

Plaintiffs have good reason to believe these records will prove up their claims, because they have already found inconsistencies in the records produced by Wyndham. When Linda Neely's tour reports were compared with her timesheets as produced by Defendant, it shows that she was sometimes clocked in after a tour started, or clocked out before it ended. See Dkt. No. 69, Exh. E. The credit check record for one of Steven Bradley's sample contracts provides a

timestamp of 04-14-2013, 6:17pm, even though his time record for the same date, shows that he

clocked in at 7:57am and clocked out at 5:13pm. See Dkt. No. 69, Exh. F.

### 3.    Wyndham's Defense against Willfulness is Unsupported by the Record.

Wyndham has provided no evidence that its actions were not willful despite the fact that

Plaintiffs requested all documents on which Defendants planned to rely on in support of any

claim that its method of compensating Plaintiffs was not a willful violation of the FLSA and/or

was performed with a good faith belief that Wyndham was complying with the FLSA. Exh. A,

Excerpted Responses to Plaintiffs' Discovery Requests. In response to Plaintiffs' Interrogatory

No. 8, which specifically asks Wyndham to describe its reasons for asserting any FLSA

exemptions, Wyndham responded as follows:

> Defendants object to this interrogatory to the extent that it seeks information protected
> from discovery by the attorney-client privilege and the work-product doctrine.
> Defendants further object to this interrogatory on the grounds that the format of this
> interrogatory impermissibly calls for all information supporting a claim or defense, and
> this request is not sufficient under the Federal Rules of Civil Procedure to impose an
> obligation on Defendants to synthesize all of their knowledge or marshal all factual proof
> in response. Subject to and without waiving these objections, Defendants maintain that its
> sales representatives may be exempt from the minimum wage and overtime provisions of
> the FLSA under the retail and service establishment exemption in Section 7(i).
> Defendants further maintain that its discovery representatives may be exempt from the
> minimum wage and overtime provisions of the FLSA under the retail and service
> establishment exemption in Section 7(i). See 29 U.S.C. § 207(i). Plaintiffs may have held
> other positions that are exempt under Section 7(i), and Defendants reserve the right to
> apply the exemption to those positions consistent with its affirmative defenses and based
> on the information revealed during discovery.

Exh. A. In response to corresponding requests for production, Wyndham never provided any

documents other than its own payroll records, time sheets, and policy handbooks, to support its

position.

In sum, it is unreasonable, if not reckless, for Defendant to have considered Plaintiffs as exempt employees when there are clearly no exemptions that apply to them. Also, there is no evidence in the record of Defendant's subjective belief that Plaintiffs were exempt, and Wyndham has outright refused to produce such evidence. Defendant has put forth no effort to adhere to the FLSA and instead has acted with complete disregard for the FLSA's record-keeping and overtime compensation requirements.

### 4.    Wyndham's Overtime Policy has been Challenged in Prior Lawsuits

Wyndham had plenty of opportunity to determine if its pay policy complied with the FLSA.  Wyndham has been sued for FLSA violations at dozens of times in the past ten years. *See, e.g., White et al v. Wyndham Worldwide Corp. Inc. et al*, 2:07-cv-00618 (N.D. Ala.); *Massaconi et al v. Wyndham Vacation Ownership Inc., et al*, 3:08-cv-30074 (D. Mass.); *Bowers v. Wyndham Vacation Resorts Inc.*, 1:08-cv-02502 (D. Col.); *Pierce v. Wyndham Vacation Resorts, et al*, 3:13-cv-00641, (E.D. Tenn.); S*chleimer v. Wyndham Vacation Ownership Inc., et al*, 6:14-cv-00108 (M.D. Fla.); *Chung v. Wyndham Vacation Resorts, Inc.*, 3:14-cv-00490 (M.D. Penn.); *Bitner, Thomas et al v. Wyndham Vacation Resorts, Inc.*, 3:13-cv-00451 (W.D. Wis.); Such repetitive legal action is sufficient to put Wyndham on notice that its pay practices are not in compliance with the FLSA. The Sixth Circuit Court of Appeals has granted summary judgment for FLSA plaintiffs on the issue of willfulness where there is undisputed evidence that an employer "had actual notice of the requirements of the FLSA by virtue of earlier violations". *Dole v. Elliott Travel & Tours, Inc*., 942 F.2d 962, 967 (6th Cir. 1991). Undisputed evidence includes prior Department of Labor Investigations. *See Herman v. Palo Group Foster Home, Inc*., 183 F.3d 468, 474 (6th Cir. 1999). While the continuous filing of lawsuits alleging FLSA

violations may not rise to the level of *undisputed* evidence of willfulness, Plaintiffs argue that it is certainly enough to create a question of fact.

Wyndham also asserts that the unresolved retail sales exemption shows that they did not willfully violate the FLSA. However, "[w]hether an employee is exempt is determined by the employee's actual work activities, not by the employer's characterization of those activities through a job title or job description." *Hunter v. Sprint Corp.*, 453 F.Supp.2d 44, 51 (D.D.C. 2006) quoting *Cooke v. General Dynamics Corp.*, 993 F.Supp. 56, 61 (D.Conn.1997). Whether the retail sales exemption applies to timeshare salespeople is an issue of first impression in the Fourth Circuit. District courts outside the Fourth Circuit have held that the exemption does not apply, and Wyndham has not stated that it relied on its attorneys' advice, Department of Labor advisory letters, or any other source in claiming this exemption. Therefore, Wyndham has no creditable legal basis to assume that Plaintiffs were exempt. Wyndham acted with willful disregard as to whether its practices violated the FLSA.

When the evidence is viewed in the light most favorable to Plaintiffs, a genuine issue of material fact still exists as to willfulness. *See, e.g., Fowler v. Land Mgmt. Groupe, Inc.*, 978 F.2d 158, 163-64 (4th Cir.1992). Finally, because wilfullness will impact the computation of unpaid overtime compensation, such a determination is best left for trial.

II.

**THE RETAIL SALES EXEMPTION DOES NOT APPLY**

In trying to shoehorn this case to fit into an affirmative defense intended for employees selling retail products from a retail establishment, Wyndham skips over major requirements of the exemption and asks the Court to engage in a creative and legally unsupported interpretation of the retail sales exemption. Material issues of law and fact remain which preclude summary

15

judgment on this affirmative defense, and as such, summary judgment on this issue should be denied.

In order for Wyndham to prevail, it must establish that there are no material issues of factual dispute with regard to each of the three requirement of the retail sales exemption, an affirmative defense which Defendant bears the burden of proof. These requirements are that (1) the employee must be employed by a retail or service establishment; (2) the employee's regular rate of pay must be more than one and one-half times the applicable minimum wage; and (3) more than half of the employee's compensation for a representative period must be from commissions on goods or services. 29 U.S.C. §207(i). Wyndham, as the employer, bears the burden of showing this exemption applies. *Clark V. J.M. Benson Co., Inc*., 789 F.2d 282, 286 (4th Cir. 1986). "Exemptions to the FLSA are limited to those employees 'plainly and unmistakably within [the] terms and spirit' of the exemption." *Thomas v. County of Fairfax*, 758 F.Supp. 353 (E.D. Virginia 1991) (citing *Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388 (1960)).

Wyndham has failed to even address elements it is required to prove in order to meet this exemption, such as whether Wyndham's sales division constitutes a "retail or service establishment." This failure to establish a lack of a factual dispute that it qualifies as a "retail or service establishment" is by itself sufficient to defeat summary judgment. In addition, Wyndham has failed to show there is no issue of material fact in determining whether the Sales Representatives earned one and one-half times the minimum wage for each hour worked. More importantly, Wyndham admits that it only meets two of the three requirements, and because all three must be met to claim the exemption, Wyndham's motion for summary judgment is deficient on its face. *See* Def. Br. at 24. As a result, summary judgment must be denied.

### 1.  Wyndham Vacation Resorts Is Not a "Retail or Service Establishment"

16

To meet the retail sales exemption, an employee must be employed by a "retail or service establishment," defined as "an establishment 75 per centum of whose annual dollar volume of sales of goods or services (or of both) is not for resale and is recognized as retail sales or services in the particular industry." 29 C.F.R. § 779.411.[3] Wyndham has failed to demonstrate that it is a "retail or service establishment," and for this reason alone, its Motion for summary judgment must fail.

A. Wyndham's Sales Team Is Not a Retail or Service Establishment

The case law has long established that real estate, including timeshares, is not a retail good, and as such, an establishment selling real estate is not a retail or service establishment for purposes of the exemption. *See Williams v. Trendwest Resorts, Inc*., 2007 WL 2429149 (D. Nev. August 20, 2007); *Davidson v. Orange Lake Country Club, Inc*., 2008 WL 254136 (M.D. Fl. Jan. 29, 2008). Application of the retail sales exemption depends first on the character of the establishment seeking the exemption. 29 C.F.R. §779.302. The regulations provide guidance as to what constitutes an "establishment," meaning a "distinct physical place of business." 29 C.F.R. §779.303. Wyndham's argument has two other fatal flaws: (1) Wyndham presents no facts regarding the percentage of dollar volume of sales it considers to be retail and (2) Wyndham cannot establish that the real estate products sold by Sales Representatives are a "retail product".

A "retail or service establishment" is "an establishment 75 per centum of whose annual dollar volume of sales of goods or services (or of both) is not for resale and is recognized as

---

[3] 29 U.S.C. §207(i) previously referred to the definition of "retail or service establishment" provided by §213(a)(2), which has since been repealed; however, courts have continued to apply the definition from §213(a)(2) and the case law interpreting it. See Reich v. Delcorp, Inc., 3 F.3d 1181, 1183-84 (8th Cir. 1993).

retail sales or services in the particular industry." 29 C.F.R. § 779.312.[4] Wyndham's sales team does not meet the requirements to be considered a "retail or service establishment." The products sold by the Sales Representatives—real estate interests and ownership "points" that can be used to book resort stays and/or transportation at various Wyndham locations—do not have a retail concept, and are not recognized as retail within the industry.

Plaintiffs Jonathan Anderson, Steve Bradley, Jennifer Crawford, Michelle Johnson, Larry Marshall, John Maynard, Mike Smith, and William Suitt stated that when they pitched a timeshare she would compare it to renting an apartment or buying a home. "Timeshares are similar to real estate because you get an actual ownership interest in the property. You can even transfer your interest by selling it, or leave it to a family member as an inheritance." Exh. B, Plaintiffs' Declarations, ¶6. These characteristics make a timeshare much more similar to real estate, which is not recognized as a retail product, as further detailed below.

B.     Less than 75% of Wyndham's Gross Income Derives from the Sale of Retail Products

While Wyndham recites the 75% requirement of this definition (Def.  Br. at 37), it provides no evidence to support that Wyndham meets this requirement. Wyndham focuses solely on establishing that the product Sales Representatives is a "vacation package" that meets the retail services requirement, and states that Wyndham has "no expectation that its vacation packages will be *immediately* resold." *Id*. But this is not the proper scope of the inquiry. Rather,

---

[4] Section 13(a)(2) of the FLSA previously exempted from overtime certain employees of a "retail or service establishment" and provided this definition of that term. 29 C.F.R. §779.312. In 1961, Congress enacted the section 7(i) retail sales exemption, and indicated that the term "retail or service establishment" was to have the same meaning under 7(i) as it did under 13(a)(2). *Burden v. SelectQuote Ins. Servs*., 848 F.Supp.2d 1075, 1082-83 (N.D. Cal. 2012). After the repeal of section 13(a)(2), case law pertaining to the application of 13(a)(2) has continued to guide the DOL and the courts in applying the retail sales exemption. *Id*.

Wyndham must demonstrate that 75% of the sales made by its Sales Representatives, which includes the sales of In House, Front Line, and Discovery Sales Representatives, are recognized as retail sales or services in the industry. 29 C.F.R. § 779.313.

Multiple courts have found that establishments selling timeshares are not a traditional retail establishment. In *Williams v. Trendwest Resorts, Inc*., the District Court of Nevada rejected Trendwest's argument that it simply sold "timeshare vacations" and was therefore a retail establishment. 2007 WL 2429149 at *7 (D. Nev. August 20, 2007) (disagreed with on other grounds by *Busk v. Integrity Staffing Solutions, Inc*., 713 F.3d 525 (9th Cir. 2013)). Because purchasers of Trendwest's timeshares bought not only vacations, but "general corporate ownership rights," the court determined it was not a traditional retail business. *Id*. The court also noted that because these customers "receive real estate interests, in addition to vacation services," this company lacks a retail concept. *Id*. at *9; *see also Davidson v. Orange Lake Country Club, Inc*., 2008 WL 254136 (M.D. Fl. Jan. 29, 2008) (same). Furthermore, the Court found that "while Trendwest does offer vacation services . . .[t]hose services which Trendwest owners receive are part of the purchasers' larger ownership interests. Therefore, Defendant is not selling goods or services under the FLSA." *Id*. At *14.

Trendwest is strikingly similar to the facts here. Wyndham admits that customers who buy timeshares receive a deed. Def. Br. at 5. Tellingly, Wyndham fails to mention that its own contract states that timeshare buyers receive corporate ownership rights along with their timeshare interest. Additionally, Wyndham uses real estate contract language to refer to the execution of the agreement—the "closing date".

> Wyndham Vacation Resorts, Inc., a Delaware corporation ("Seller"), agrees to sell to the undersigned "Owner" a membership interest ("Ownership") in PTVO Owners Association, Inc., a non-stock, non-profit Delaware corporation ("Association") which

Ownership includes the right to participate in the ClubWyndham Access Vacation Ownership Plan ("Club") and the right to use and occupy Club Accommodations. . .

1. Ownership. Owner is a member of the Association, and is entitled: (a) to use Points to reserve the use of accommodations in the Club ("club Accommodations"), (b) to vote for directors of the Association, (c) to vote on major decisions of the Association, and (d) through the Club and the Association, to participate in the ownership of the assets of the Association…

5. Participation of Owner in Association Governance. The Articles of Incorporation, By-laws, and Regulations of the Association and the Declaration provide, among other things, for: (a) meetings of, and votes by Owners, (b) election of directors, and (c) use rights in Club Accommodations.

32. Effectiveness of Agreement/Closing. This Agreement will become effective upon execution by all parties and shall be deemed to have closed (the "Closing") when all of the following conditions have occurred unless waived by Seller: (a) any applicable rescission period has expired; and (b) the Owner has paid to Seller a down payment equal to not less than ten percent (10%) of the sum of the Purchase Price and the Processing Fee in immediately available funds…"

Exh. C, Timeshare Contract. Timeshare owners also receive equity in their purchase. See Exh. C, p. 8, "Equity Trade Agreement and Addendum". Wyndham not asserted any facts supporting a finding that the other products sold on its sales floor are retail sales. Instead, it appears that Wyndham only argues that the Sales Representatives sell a retail product—an assertion which is clearly erroneous based on the reasoning of the *Trendwest* decision. Therefore, the

D.     Wyndham Has Presented No Evidence Addressing Whether Its Services Are Recognized as Retail Within Its Industry

In order to qualify for the retail sales exemption, a business must prove that its services are recognized as "retail" in the industry, a determination to be made by the court. *Idaho Sheet Metal Works, Inc.*, 383 U.S. at 204-05; *Mitchell v. Kentucky Finance Co.*, 359 U.S. 290, 291 (1959). This requires considering not only the view of the employer, but the "well-settled habits of business, traditional understanding, and common knowledge" of both the purchaser and the seller. 29 C.F.R. §779.324.  First, the establishment must be part of an industry with a "retail

20

concept," and second, the establishment's services must be recognized in that industry as "retail."29 C.F.R. §§ 779.316, 779.322. Wyndham has presented no evidence to demonstrate that its products are recognized as retail by the industry. Instead, Wyndham has attempted to re-define the product sold by Sales Representatives and contort their work into the retail sales exemption, despite treating Sales Representatives as non-exempt from overtime throughout their employment. The Court's inquiry could end here with a denial of Wyndham's Motion. *See Owopetu v. Nationwide CATV Auditing Services, Inc*., 2011 WL 883703 at *8-9 (D. Vt. Mar. 11, 2011) (denying summary judgment on the retail sales exemption where the employer failed to offer any evidence as to how persons in the industry view its business).

Even if Wyndham had set forth evidence on this prong, it would be unable to show timeshares are recognized in the industry as retail sales. The regulations provide a partial list of establishments that lack a retail concept, and others that may be recognized as retail. 29 C.F.R. §§ 779.317; 779.320. "Timeshares" do not appear on either list. However, "apartment houses" and "real estate companies" are both listed as establishments lacking a retail concept, while "hotels" may be recognized as having a retail concept. 29 C.F.R. §§ 779.317, 779.320. Plaintiffs have previously demonstrated that in other courts, timeshares have not been recognized as retail sales. (*See supra* Section I.B.1.)

The American Resort Development Association ("ARDA"), a trade organization "representing the vacation ownership and resort development industries (timeshares)," and of which Wyndham is a member, is one source of understanding how Wyndham's business is perceived by the industry. (Exh. D) ARDA's "Consumer Information" page provides the following description of timeshare products:

How Vacation Ownership Works

21

> Make a one-time purchase of furnished resort accommodations at a fraction of whole ownership costs and pay an annual maintenance fee. Each unit of a timeshare resort is divided into intervals most commonly by the week or some other combination of days. Often the amount of time you purchase is expressed in terms of "points"—a popular trend that is aimed at increasing the range of options for the use of your timeshare interval. In a majority of resorts today, your vacation ownership interest will include a deeded interest in real estate."
> *Id*.

This description of timeshares is at odds with Wyndham's claim that the Discovery product is essentially the same as a package purchased from a travel agent. Def. Br. at 31. Rather, the industry's perspective is that this is a product which consumers own, pay various upkeep fees on, and can exchange with other members. Exh. D.

Wyndham provide no information demonstrating what actual customers are told about the products they are purchasing. According to Wyndham, a purchase of a vacation package is a purchase of "vacation points that can be used at any number of Wyndham's resorts throughout the country" which can be used like currency to "obtain hotel rooms, rental cars, amusement park tickets, airline tickets, and can be used to pay for cruises on major cruise lines." Def. Br. at 36. This is certainly a step removed from booking a room in a hotel, or a trip on a cruise. Wyndham has failed to demonstrate that there is no factual question as to whether timeshares are a "retail product," and has not even attempted to show that timeshares are retail products recognized as such in the industry.

Rather, Wyndham asks the Court to ignore cases analyzing timeshares under the 7(i) exemption and instead find that Discovery Sales Representatives are like car salespersons, travel agency salespersons, or window washers. Wyndham's main source of support for this position is its extremely generous reading of *Alvarado v. Corporate Cleaning Services*. 782 F.3d 365 (7th Cir. 2015). Wyndham appears to believe this decision requires lower courts to completely

abandon the regulatory guidance set forth on the definition of a "retail or service establishment." (Def. Br. at 32-33.)

But Wyndham's heavy reliance on *Alvarado* is misplaced. Most importantly, the sole service provided by the employer in *Alvarado* was the window-washing service. 782 F.3d at 366. Here, Wyndham sells multiple timeshare products. *Alvarado* also makes particular note of the fact that the window-washers do not perform their work during the entire year and commonly take the winter off. *Id*. at 368. Wyndham's Sales Representatives may be earning less during the offseason, but they are not vacationing in Mexico like the *Alvarado* plaintiffs, they are continuing to work.

Wyndham argues that because *Alvarado* employed a comprehensive analysis of the purpose of the 7(i) exemption and the overtime pay requirements in the context of the *Alvarado* plaintiffs' claims, therefore all analysis of previous cases on the 7(i) exemption should be tossed out in favor of a broad application of the exemption. But Wyndham's failure to show that Discovery Sales Representatives are employed by a retail or service establishment requires that its Motion for summary judgment be denied.

Wyndham also relies on *Reich v. Cruises Only, Inc.*, 1997 U.S. Dist. LEXIS 23727 at *11 (M.D. Fl. June 4, 1997*); But that case is inapposite. In *Cruises Only*, the salespeople only "inquire from the customer the type of cruise the customer desires, inform the customer of the available cruise options, and assist the customer in booking the cruise." *Reich,* 1997 U.S. Dist. LEXIS 23727 at *2. They did not sell any ownership interest (real estate or corporate) to their customers.

Wyndham has failed to show that no question of material fact exists as to whether Sales Representatives work in an establishment where 75% of the annual dollar volume of sales is

23

recognized as retail in its industry. Wyndham attempts to argue that at the very least, Discovery Representatives should be exempted because they sell trial packages which do not come with any ownership interest. But Wyndham has presented no facts to show that the Discovery product constitutes 75% of the annual dollar value of products sold by its sales team. Nor has Wyndham presented any evidence of how any of its products are perceived in the industry. Even if Wyndham had pled such facts, Plaintiffs have clearly shown there to be a question of fact on whether timeshare sales are a retail concept within the meaning of the regulations. Wyndham's failure to satisfy its burden here means summary judgment must be denied.

### 2. 50% of Income Must Be From Commissions in a "Representative Period"

A second requirement to qualify for the retail sales exemption is that more than half of the employee's total earnings in a representative period must consist of commissions. *Alvarado*, 782 F.3d at 366. Plaintiffs do not dispute that Sales Representatives were paid, in part, a commission based on the number of sales made.

The regulations provide some guidance for the appropriate "representative period" to be used for determining whether commissions constitute most of an employee's pay:

> To this end the period must be as recent a period, of sufficient length (see paragraph (c) of this section) to fully and fairly reflect all such factors, as can practicably be used. Thus, as a general rule, if a month is long enough to reflect the necessary factors, the most recent month for which necessary computations can be made prior to the payday for the first workweek in the current month should be chosen. Similarly, if it is necessary to use a period as long as a calendar or fiscal quarter year to fully represent such factors, the quarterly period used should ordinarily be the one ending immediately prior to the quarter in which the current workweek falls.

29 C.F.R. §779.417(b).

Wyndham incorrectly argues that as long as a plaintiff's draw balance is zero at the end of his or her employment, she has been paid 100% commissions throughout his or her employment. Def. Br. At 38. This is not sanctioned by the regulations. To determine whether this requirement is met, the employer must use a representative period that "typifies the total characteristics of an employee's earning pattern in his current employment situation." 29 C.F.R. §779.417. The regulations also note that while no upper limit is set for the period to be considered, "the statutory intent would not appear to be served by any recognition of a period in excess of 1 year as representative for purposes of this exemption." 29 C.F.R. §779.417(c). Using the entirety of an employee's employment does not comport with this requirement – for one matter, it is entirely retrospective, and would not be possible to apply during an individual's employment to determine whether the requirement had been met.

However, the use of each week as a representative period, as appears to be the calculation actually performed by Wyndham, does take into account the seasonal nature of the earnings by Sales Representatives. Dkt. No. 96-8, Pechaitis Dec. at ¶9. However, the number of hours worked by Plaintiffs is still in dispute and therefore summary judgment would be improper. Even under the various hours-worked scenarios calculated by Wyndham, Plaintiffs do not meet the one-and-half times minimum wage requirement for a majority of the year.

**3.      Sales Representatives Did Not Earn More than One and One-Half Times the Minimum Wage For the Majority of Weeks**

Finally, in order to qualify for the 7(i) retail sales exemption, an employee's regular rate of pay, determined by dividing hours worked by weekly earnings, must exceed one and one-half times the minimum wage. 29 C.F.R. §779.419. A central question in this case has been the number of hours worked by all Sales Representatives. As the final prong of the retail sales

25

exemption is dependent upon the number of hours worked by employees, Wyndham cannot show there is no question of material fact as to whether the exemption is met in any of these weeks as the precise number of hours worked has yet to be established.

Wyndham's calculations rely upon a "hypothetical, assumed weekly hours in increments of 45 hours per week, 50 hours per week, 60 hours per week, 65 hours per week, and 70 hours per week." Dkt. No. 96-8*, Pechaitis Dec.* at ¶ 8. The responses provided by plaintiffs included a damage calculation spreadsheet which provided a formula for calculating damages, and allowed hours worked per week to be adjusted given the lack of accurate records of time worked. *Id.* All of the Plaintiffs have been deposed, and have provided estimates in deposition of the number of hours they worked per week. There is a clear question of fact as to how many hours were worked by Sales Representatives; as such, determining whether this prong of the exemption is met cannot be answered as a question of law. Therefore, Wyndham's Motion for summary judgement must be denied.

### III.
### SUMMARY JUDGMENT ON
### PLAINTIFFS' HOURS WORKED IS IMPROPER

Wyndham argues that it is entitled to summary judgment during specific weeks for which Plaintiffs have admitted they cannot assert minimum wage or overtime claims. Wyndham goes on to state that some Plaintiffs concede that during certain weeks of employment they did not work more than 40 hours. Wyndham further states that the Plaintiffs only make conclusory statements that they worked overtime, and many admitted during deposition that they did not know exactly how many hours of overtime they worked in some weeks of employment.

**1. Genuine Issues of Material Fact Exist Regarding Plaintiffs' Hours And Pay**

However, Wyndham grossly mischaracterizes the statements made by the Plaintiffs. A statement that a Plaintiff is not sure how many hours he or she worked in a given week is not tantamount to a declaration that he or she never worked any unpaid overtime, or received less than the minimum wage for all hours worked.

For example, when reviewing his payroll statements during deposition Gary Conklin stated, "So we can go over all 140 of these, 150 of these, and I'm going to give you the same answer: I don't recall any of these...I get paid commission from something that happened three weeks ago, could have been four weeks ago, could have been six weeks ago, depending on when they made their down payment." Exh. H, Conklin Dep. Tran. p. 118. But Mr. Conklin also testified, "I would say 99.9 percent of [my payroll statements] are inaccurate . . . I contend I worked more hours than on every sheet that we have in front of us." (*Id.*, p. 114-115). "I know that, shoot, probably upwards of 50 percent of the time I was off the clock when I worked for this company." (*Id.*, 118:24-119:1).

Similarly, when Linda Neely was asked if she was seeking any overtime for the week ending February 16, 2012 she answered "I don't really know". Exh. I, Neely Dep. Trans. p. 132. But after being shown paychecks where reflected that she only worked 9.5, 26.75, and 2.25 hours for pay periods in June and July 2011 she responded, "I don't know where these small amounts came from. Nobody would have kept me on the payroll if that's all I'd have worked." *Id.*, p. 110-114.

Richard Reynolds made similar averments. He did state that he could not recall his overtime hours for specific week. Exh. K, Reynolds Dep. Trans. p. 146. But when asked, "You would agree with me that you were paid at least minimum wage that week [of June 16, 2011]?" he answered, "As represented on this sheet, that's what that appears, yes." *Id.*, Dep. Trans. p.

27

144-145. He also said, "I'm asserting a minimum wage claim and overtime claim for the entire time that I worked [at Wyndham]." *Id.*, p. 163).

A careful review of the statements made by Plaintiffs in their depositions shows that the many of them refer to calculations of their pay and hours worked *according to Wyndham's payroll records*--which they have repeatedly and consistently stated are *inaccurate* due to its FLSA violations. The facts here are inconclusive. Because Plaintiffs' hours worked is a contested issue of material fact, summary judgment is improper. Plaintiffs have provided evidence to prove their claims in the form of sworn declarations, deposition testimony and written discovery responses). Therefore Wyndham cannot prove that they failed to meet their burden such that summary judgment is warranted on this issue.

### 2. Plaintiffs Are Not Required to Recall Specifically How Many Hours They Worked Each Week.

Defendants argue that some Plaintiffs testified at deposition "that they did not know how many hours they worked and had no records or other evidence to support any claims for hours worked other than Wyndham's time records." Def. Br. at 41. More importantly, it is well established that plaintiffs in FLSA cases "need not prove each hour of overtime work with unerring accuracy or certainty." *Lee v. Vance Executive Protection*, 7 Fed. Appx. 160, 166 (4th Cir. 2001). Rather, Plaintiffs must simply provide enough evidence "so that the court as a matter of just and reasonable inference may estimate the unrecorded hours." *Id.* The Supreme Court's requirement of "sufficient evidence to show the amount and extent of the work as a matter of just and reasonable inference" was created to prevent an employer from taking advantage of its own record-keeping violations under the FLSA. *Anderson v. Mt. Clemens Pottery*, 328 U.S. 680, 687-

688 (1946) (superseded on other grounds as stated in *McKenna v.Champion Intern. Corp*., 747

F.2d 1211, 1214 (8th Cir. 1984)). As the Supreme Court explained:

> "But where the employer's records are inaccurate or inadequate and the employee cannot
> offer convincing substitutes a more difficult problem arises. The solution, however, is not
> to penalize the employee by denying him any recovery on the ground that he is unable to
> prove the precise extent of uncompensated work. Such a result would place a premium on
> an employer's failure to keep proper records in conformity with his statutory duty; it
> would allow the employer to keep the benefits of an employee's labors without paying
> due compensation as contemplated by the Fair Labor Standards Act. In such a situation
> we hold that an employee has carried out his burden if he proves that he has in fact
> performed work for which he was improperly compensated and if he produces sufficient
> evidence to show the amount and extent of that work as a matter of just and reasonable
> inference. The burden then shifts to the employer to come forward with evidence of the
> precise amount of work performed or with evidence to negative the reasonableness of the
> inference to be drawn from the employee's evidence. If the employer fails to produce
> such evidence, the court may then award damages to the employee, even though the
> result be only approximate." *Id*.

Furthermore, Plaintiffs have provided sworn declarations and deposition testimony which assert

that they were not able to record all of their hours worked, and/or that their hours were shaved by

their managers. *See Dkt. No. 69*, Plaintiffs' Motion for Conditional Certification. Thus it is

simply not true that any of the Plaintiffs have no evidence to support claims for unpaid overtime

hours worked. Wyndham should not be allowed to raise Plaintiffs' burden of proof above the

current legal standard, or to take advantage of their deliberately cultivated fraudulent records.

### 3.     The Court is Not Permitted to Make Judgments About Credibility on Summary Judgment, Where the Evidence or Testimony Conflicts.

There is an ongoing dispute regarding the number of hours Plaintiffs worked, but

Wyndham tries to avoid this dispute by arguing that Plaintiffs' testimony is "conclusory" and

"self-serving." This is a credibility argument in disguise, which pits the Plaintiffs' believability

against that of the Defendants' written time records. *Id*. Defendants' reasoning goes against the

29

time honored standard of review for summary judgment, which discourages courts from deciding the credibility of conflicting evidence or testimony at the summary judgment stage. *Anderson v. Liberty Lobby*, 477 U.S. 242, 249 (1986)("at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."); *Meyers v. Baltimore County*, 713 F.3d 723, 730 (4th Cir. Feb. 1, 2013)(credibility determinations are not part of summary judgment proceedings).

## CONCLUSION

Wyndham has failed to show that there is no genuine issue of material fact as to its claims for dismissal based on the statute of limitations; Richard Reynolds' alleged lack of standing; Plaintiffs' alleged lack of evidence to show Wyndham's willful violation of the FLSA; the applicability of the retail sales exemption; and Plaintiffs' unpaid overtime and minimum wage claims. Plaintiffs pray that the court deny Wyndham's Motion for Summary Judgment in its entirety, and grant them such other and further relief to which they may be entitled.


Respectfully submitted,


**/S/William J. Luse_____**
William J. Luse
Federal I.D: 9736
1601 Oak Street, Suite 201
Myrtle Beach, SC 29577
Telephone: 843-455-6049
Facsimile: 843-839-9831

Trang Q. Tran
*Pro Hac Vice*
Federal I.D. 20361
TRAN LAW FIRM
9801 Westheimer Road, Suite 302
Houston, Texas 77056

30

Telephone: (713) 223-8855
Facsimile: (713) 623-6399
E-mail:ttran@tranlawllp.com

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing was

forwarded on Monday, September 30, 2015 in the following manner.

**VIA FACSIMILE 864-235-1381**

Chase Samples
D. Christopher Lauderdale
Jackson | Lewis LLP
One Liberty Square
55 Beattie Place, Suite 800
Greenville, SC 29601

/S/William J. Luse
William J. Luse

31